

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-13,374-05

### EX PARTE BOBBY JAMES MOORE, Applicant

### ON APPLICATION FOR WRIT OF HABEAS CORPUS IN CAUSE NO. 314483-C IN THE 185TH JUDICIAL DISTRICT COURT HARRIS COUNTY

JOHNSON, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, KEASLER, HERVEY and RICHARDSON, JJ., joined. ALCALÁ, J., filed a dissenting opinion. YEARY, J. concurred. NEWELL, J., did not participate.

### O P I N I O N

In 1980, appellant was convicted of capital murder and sentenced to death for fatally shooting a seventy-year-old grocery clerk, James McCarble, in Houston, Texas, while committing or attempting to commit robbery. *See* TEX. PENAL CODE ANN. § 19.03(a). We affirmed the 1980 conviction and sentence. *Moore v. State*, 700 S.W.2d 193 (Tex. Crim. App. 1985). Following a grant of federal habeas corpus relief, the trial court held a new punishment hearing in February 2001. Appellant again received a death sentence. We affirmed the trial court's judgment on direct appeal. *Moore v. State*, No. AP-74,059, slip op.

(Tex. Crim. App. Jan. 14, 2004) (not designated for publication).

In this initial writ application challenging his 2001 punishment retrial and death sentence, applicant raises forty-eight claims for relief. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071. In January 2014, the habeas judge held a two-day evidentiary hearing on applicant's first claim for relief—the allegation that he is intellectually disabled and therefore exempt from execution under the Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).[1]

Following the evidentiary hearing, the parties filed proposed findings of fact and conclusions of law. Applicant's proposed findings and conclusions were contained in a document entitled, "Addendum Findings of Fact and Conclusions of Law on Claims 1–3" (Addendum Findings). Despite the document's caption, applicant's proposed findings and conclusions addressed only his *Atkin*s claim (i.e., his first claim for relief). The State's proposed findings of fact and conclusions of law addressed all of applicant's alleged grounds for relief.

The habeas court signed applicant's proposed Addendum Findings. The Addendum Findings applied the definition of intellectual disability presently used by the American

---

[1] Mental-health advocates now generally favor the term "intellectually disabled" over the older term "mentally retarded," which they deem to carry pejorative connotations. *See Ex parte Cathey*, 451 S.W.3d 1, 4 n.4 (Tex. Crim. App. 2014). However, the terms refer to the same condition and may be used interchangeably. *See id.* In this opinion, we substitute the terms "intellectual disability" and "intellectually disabled" for "mental retardation" and "mentally retarded."

Association on Intellectual and Developmental Disabilities (AAIDD),[2] concluded that applicant is intellectually disabled under that definition, and recommended that we grant relief on his *Atkins* claim.[3] The Addendum Findings also concluded that applicant had

---

[2]  The DSM-IV states the diagnostic criteria for intellectual disability as follows:

A.  Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test . . . .

B.  Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

C.  The onset is before age 18.

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 46 (APA, 4th ed. 1994) (DSM-IV).

The DSM-V defines intellectual disability as "a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 33 (APA, 5th ed. 2013) (DSM-V). The DSM-V states that the following three diagnostic criteria must be met:

A.  Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing [Criterion A].

B.  Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community [Criterion B].

C.  Onset of intellectual and adaptive deficits during the developmental period [Criterion C].

*See id.* To meet the DSM-V's diagnostic criteria for intellectual disability, "the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A." *See id.* at 38.

[3]  The AAIDD, which until 2007 was called the American Association on Mental Retardation (AAMR), is a professional non-profit association that advocates for the rights of the mentally impaired and those with developmental disabilities. *See Cathey*, 451 S.W.3d at 15 n.40. The AAIDD currently defines intellectual disability as a condition "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." INTELLECTUAL DISABILITY 5 (AAIDD AD HOC COMM. ON TERMINOLOGY AND CLASSIFICATION, 11th ed. 2010).

established by a preponderance of the evidence that he is intellectually disabled under the diagnostic criteria stated in the fourth and fifth editions of the American Psychiatric Association's (APA's) Diagnostic and Statistical Manual of Mental Disorders (DSM), i.e., the DSM-IV and DSM-V.

The habeas court also signed the State's proposed findings of fact and conclusions of law after making certain handwritten alterations to the final page. Through its alterations, the habeas court: (1) indicated that applicant's grounds for relief should be granted in part and denied in part; and (2) adopted the State's proposed findings and conclusions concerning claims four through forty-eight, as well as its recommendation that we deny relief concerning those claims. The habeas court made no findings or conclusions regarding applicant's claims two and three.

We filed and set the case to address applicant's *Atkins* allegation. We now deny relief on all of applicant's claims.

In *Atkins*, the Supreme Court determined that the execution of intellectually disabled individuals violates the Eighth Amendment, but left it to the States to develop appropriate ways to enforce the constitutional restriction. *See Atkins*, 536 U.S. at 317, 320. In *Ex parte Briseno*, citing the absence of legislation to implement *Atkins*'s mandate, we adopted the definition of intellectual disability stated in the ninth edition of the AAMR manual, published in 1992, and the similar definition of intellectual disability contained in section 591.003(13) of the Texas Health and Safety Code. *See Ex parte Woods*, 296 S.W.3d 587, 589 & n.4 (Tex.

Crim. App. 2009); *Briseno*, 135 S.W.3d at 7.

Because our Legislature has not enacted legislation to implement *Atkins*'s mandate, we continue to follow the AAMR's 1992 definition of intellectual disability that we adopted in *Briseno* for *Atkins* claims presented in Texas death-penalty cases. *See In re Allen*, __ S.W.3d __, __, Nos. WR-82,265-01 & WR-82,265-02, slip op. at *7–8 (Tex. Crim. App. May 13, 2015); *Woods*, 296 S.W.3d 587, 589. Thus, to demonstrate that he is intellectually disabled for Eighth Amendment purposes and therefore exempt from execution, an applicant must prove by a preponderance of the evidence that: (1) he suffers from significantly sub-average general intellectual functioning, generally shown by an intelligence quotient (IQ) of 70 or less; (2) his significantly sub-average general intellectual functioning is accompanied by related and significant limitations in adaptive functioning; and (3) the onset of the above two characteristics occurred before the age of eighteen. *See Ex parte Cathey*, 451 S.W.3d 1, 19 (Tex. Crim. App. 2014); *Ex parte Sosa*, 364 S.W.3d 889, 894 (Tex. Crim. App. 2012); *Briseno*, 135 S.W.3d at 7 n.25.

The habeas judge therefore erred by disregarding our case law and employing the definition of intellectual disability presently used by the AAIDD, a definition which notably omits the requirement that an individual's adaptive behavior deficits, if any, must be "related to" significantly sub-average general intellectual functioning.[4] The habeas court reasoned that, in *Briseno*, we derived our legal test for intellectual disability in capital cases from the

---

[4] The diagnostic criteria set forth in the DSM-IV similarly does not require that an individual's adaptive deficits be related to significantly sub-average intellectual functioning. *See* DSM-IV 46.

AAMR's 1992 definition of intellectual disability. Because the AAMR's and APA's conceptions of intellectual disability and its diagnosis have changed since *Atkins* and *Briseno* were decided, the habeas court concluded that it should use the most current position, as espoused by AAIDD, regarding the diagnosis of intellectual disability rather than the test that we established in *Briseno*.

It may be true that the AAIDD's and APA's positions regarding the diagnosis of intellectual disability have changed since *Atkins* and *Briseno* were decided. Indeed, we have recently discussed the subjectivity surrounding the medical diagnosis of intellectual disability and some of the causes for that subjectivity. *See Cathey*, 451 S.W.3d at 10 & nn. 22–23. But although the mental-health fields and opinions of mental-health experts inform the factual decision, they do not determine whether an individual is exempt from execution under *Atkins*. *See id.* at 9–10 (stating that we must apply our own judgment on the appropriate ways to enforce the ultimately legal prohibition on executing intellectually disabled offenders). The decision to modify the legal standard for intellectual disability in the capital-sentencing context rests with this Court unless and until the Legislature acts, which we have repeatedly asked it to do. *See Ex parte Hearn,* 310 S.W.3d 424, 428 (Tex. Crim. App. 2010); *see, e.g.,* *Allen*, __ S.W.3d at __, Nos. WR-82,265-01 & WR-82,265-02, slip op. at *7–8. We conclude that, at this juncture, the legal test we established in *Briseno* remains adequately "informed by the medical community's diagnostic framework." *See Hall v. Florida*, 134 S.

Ct. 1986, 2000 (2014).[5]

Regarding *Briseno*'s first prong, "general intellectual functioning" is "defined by the [IQ]" and "obtained by assessment with a standardized, individually administered intelligence test." *See Ex parte Hearn*, 310 S.W.3d 424, 428 n.7 (Tex. Crim. App. 2010). There is a measurement error of approximately five points in assessing IQ, which may vary from instrument to instrument. *Id*. at 428. Therefore, when determining whether an applicant has met *Briseno*'s first prong, we consider the fact that any IQ score could actually represent a score that is five points higher or five points lower than the score that he actually obtained. *See id*.

In *Cathey*, we examined whether mental-health experts or factfinders should adjust IQ scores for the "Flynn Effect"[6] in making a determination of intellectual disability under *Atkins*. *See Cathey*, 451 S.W.3d at 14. We concluded that, although factfinders may consider the concept of the Flynn Effect in assessing the validity of a score obtained on a now "outmoded" or "outdated" version of an IQ test, they may consider that effect only in the way that they consider an IQ examiner's assessment of malingering, depression, lack of

---

[5] We derived *Briseno*'s legal definition of intellectual disability from a medical definition that the AAMR had previously advocated. *See Woods*, 296 S.W.3d at 589 & 589 n.4; *Briseno*, 135 S.W.3d at 7 & n.26. *Briseno*'s legal definition remains generally consistent with the AAIDD's current definition of intellectual disability. Further, *Briseno*'s requirement—that any significant adaptive behavioral deficits be "related" to significantly sub-average general intellectual functioning—is consistent with the APA's current position on the issue. *See* DSM-V 38 (emphasizing that an individual's "deficits in adaptive functioning must be directly related to [his] intellectual impairments" to meet the diagnostic criteria for intellectual disability).

[6] The "Flynn Effect" refers to the tendency of scores on IQ tests normed on a particular date to increase over time, as the tests' norms age. *See Cathey*, 451 S.W.3d at 12–13.

concentration, etc. *Id*. at 5, 18 n.54 (explaining that "outmoded" in this context "means simply that the test [at issue] was designed and normed several years earlier" and "not that there was a newer, 'better' test available" at the time). We stated that the IQ test score itself may not be changed. *Id*. at 18. In analyzing whether applicant's general intellectual functioning is significantly sub-average, the habeas court therefore erred by subtracting points from applicant's IQ scores for the Flynn Effect and considering both applicant's unadjusted and Flynn-Effect-adjusted IQ scores.[7]

For purposes of the Eighth Amendment, "adaptive behavior" refers to the ordinary skills that are required for people to function in their everyday lives. *Id.* at 19. We have cited with approval the AAIDD's grouping of adaptive behavior into three areas (conceptual skills, social skills, and practical skills) for purposes of making a clinical diagnosis of intellectual disability.[8] *See Hearn*, 310 S.W.3d at 428. Limitations in adaptive behavior can be determined by using standardized tests. *See id.* We have also recognized the APA's

---

[7] We recognize that the habeas court did not have the benefit of our opinion in *Cathey* when it entered its Addendum Findings. However, neither the record in applicant's case nor the law on which the habeas court relied support its findings and conclusions concerning the Flynn Effect. In particular, the record does not support the habeas court's representation of the AAIDD's present stance on the Flynn Effect. *See* INTELLECTUAL DISABILITY 35, 37 (describing the Flynn Effect as one of the "challenging issues" in the measurement of intelligence and interpretation of IQ scores, and noting the limited circumstances in which the AAIDD approves of adjusting an IQ score downward for the Flynn Effect).

[8] In *Hearn*, we noted the AAIDD's breakdown of these behavioral areas:

Conceptual skills include skills related to language, reading and writing, money concepts, and self-direction. Social skills include skills related to interpersonal relationships, responsibility, self-esteem, gullibility, naivete, following rules, and avoiding victimization. Practical skills are skills related to activities of daily living and include occupational skills and maintaining a safe environment.

*Hearn*, 310 S.W.3d at 428 n.9.

position, expressed in the DSM-IV, that for purposes of clinical diagnosis, a "significant limitation" is defined by a score of at least two standard deviations below either (1) the mean in one of the three adaptive behavior skills areas or (2) the overall score on a standardized measure of conceptual, social, and practical skills. *See id.* Although standardized tests are not the sole measure of adaptive functioning, they may be helpful to the factfinder, who has the ultimate responsibility for determining intellectual disability in the *Atkins* context. *See id.*

In the Eighth Amendment context, it is not sufficient for an applicant to establish by a preponderance of the evidence that he has significantly sub-average general intellectual functioning and significant limitations in adaptive functioning. *See id.* An applicant must also demonstrate by a preponderance of the evidence that his adaptive behavior deficits are related to significantly sub-average general intellectual functioning rather than some other cause. *Cf. id.* (stating that the applicant must show that his adaptive deficits were related to significantly sub-average general intellectual functioning rather than a personality disorder); *Ex parte Blue*, 230 S.W.3d 151, 163–64 (Tex. Crim. App. 2007) (determining that the applicant had not made a prima facie case concerning adaptive deficits because his expert conceded that learning disabilities or an impoverished family background, or both, may have been responsible for applicant's alleged deficit). The habeas court in this case failed to make the relatedness inquiry.[9]

---

[9] The habeas court concluded that applicant was intellectually disabled under the DSM-V's diagnostic criteria. As we have discussed, *Briseno* is the applicable standard for the *Atkins* determination. But like *Briseno*, the DSM-V

In making the relatedness determination, the factfinder may consider the seven evidentiary factors that we developed in *Briseno*:

- Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was [intellectually disabled] at that time, and, if so, act in accordance with that determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8–9. We look to the entirety of the record before us in an *Atkins* inquiry. *See Cathey*, 451 S.W.3d at 26–27 (stating that factfinders should "consider *all* possible data that sheds light on a person's adaptive functioning, including his conduct in a prison society, school setting, or 'free world' community"). In addition, we "consider *all* of

---

requires that an individual's adaptive behavior deficits are directly related to his significantly sub-average intellectual functioning. Because the habeas court did not engage in the relatedness inquiry, the record does not support its finding that applicant meets the DSM-V's diagnostic criteria.

the person's functional abilities," including "those that show strength as well as those that show weakness." *See id.* at 27. The habeas court therefore additionally erred to the extent that it found that applicant's prison records were "not appropriate tools by which to exclude intellectual disability in capital murder cases" and considered only weaknesses in applicant's functional abilities. *See id.*

In failing to make the relatedness inquiry, the habeas judge's factual findings and legal conclusions left the second prong of the *Briseno* test unresolved. *See Ex parte Flores*, 387 S.W.3d 626, 634–35 (Tex. Crim. App. 2012) (stating that the rationale for the deference we generally accord to habeas courts disappears when the factual findings fail to resolve the necessary factual issues). In addition, our independent review of the record reveals that it does not support the habeas judge's findings or conclusions concerning applicant's *Atkins* claim. *See id.* (noting that the rationale for deference also disappears when the record does not support the habeas court's findings). In short, the habeas judge appears to have either not considered, or unreasonably disregarded, a vast array of evidence in this lengthy record that cannot rationally be squared with a finding of intellectual-disability. *Cf. Sosa*, 364 S.W.3d at 894. For these reasons, we do not adopt the habeas court's findings and conclusions regarding applicant's *Atkins* claim, but instead assume our role as the ultimate factfinder in this case. *See Flores*, 387 S.W.3d at 634–35; *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).

We hold that applicant has not established by a preponderance of the evidence that he

is intellectually disabled under *Atkins* and *Briseno*. Accordingly, applicant is not exempt from the death penalty, and we deny him relief on his first ground.

## I. Factual and Procedural Background

The lengthy factual and procedural history of applicant's case is relevant to our adjudication of his *Atkins* claim and provides context for the testimony elicited by the parties at his 2014 evidentiary hearing.

## A. Applicant's 1980 Capital Murder Trial

The evidence at applicant's 1980 trial showed that, on April 25, 1980, Anthony Pradia and Willie Albert "Ricky" Koonce visited applicant at Betty Nolan's house,[10] where applicant lived when he was not staying with his girlfriend, Shirley Carmen. Pradia testified that he, Koonce, and applicant each needed money for car payments. While the three men were playing dice, Koonce suggested that they commit a robbery, and Pradia and applicant agreed. Applicant provided the weapons for the robbery, specifically, a shotgun and a .32 caliber pistol. Applicant and Pradia hid the weapons in the trunk of Koonce's car. The three men then drove around various areas of Houston in Koonce's car, looking for a place in which to commit the robbery.

After taking turns casing the Birdsall Super Market, the three men settled on it as the place in which they would commit the robbery and negotiated how they would divide the

---

[10] Applicant and various other witnesses at his 1980 trial described Nolan as applicant's "play mother" or "play aunt." In 1980, applicant's trial counsel described a "play mother" as someone "that a young man in the black community . . . turn[s] to in times of need."

proceeds. Because they were using his car, Koonce wanted a larger share of the proceeds. After some argument, Pradia and applicant agreed that they would each pay Koonce $200 from their shares. The men then discussed their roles in the robbery. They agreed that Koonce would enter the courtesy booth and take the money that was inside. Applicant would carry the shotgun and position himself at the courtesy booth so that he could guard the booth and watch the store's front entrance. Pradia would carry the pistol and empty the checkout registers.

The three men then entered the store. Pradia entered first, with the pistol in his pants. Koonce entered next. Applicant entered last.[11] The shotgun he was carrying was obscured by two plastic bags. Applicant and Pradia wore wigs. Applicant also wore sunglasses.

Applicant and Koonce approached the courtesy booth, which was staffed by store employees McCarble and Edna Scott. Koonce entered the booth, told McCarble and Scott that they were being robbed, and demanded money. Applicant, who by this time had removed the plastic bags from the shotgun, pointed the weapon at McCarble and Scott through the booth's window. When Scott screamed that the store was being robbed, applicant pointed the shotgun at McCarble, looked down the barrel, and shot him in the head. McCarble died instantly.

Applicant, Pradia, and Koonce ran from the store and got back into Koonce's car,

---

[11] In a written post-arrest statement dated April 28, 1980, Koonce asserted that applicant wanted to walk behind him so that no one would see the shotgun that applicant was carrying. Koonce did not testify at applicant's 1980 trial and his statement was not offered into evidence at that proceeding. However, in 1992, applicant filed his second application for a writ of habeas corpus pursuant to Article 11.07. The State included Koonce's statement as an exhibit to its response.

where applicant stated that he had shot the man in the booth.[12] The men fled the scene. Koonce drove back to Nolan's house to drop applicant off and to allow Pradia to retrieve his car. The men then split up. Applicant spent the night of the offense at Nolan's house.

Witnesses provided a license-plate number and descriptions of the getaway vehicle and perpetrators, which quickly led Houston Police Department (HPD) homicide detectives to arrest Koonce. While searching Koonce's vehicle, officers discovered Pradia's wallet and identification, which Pradia had inadvertently left behind. Following Koonce's arrest, Pradia turned himself in. Based on information in Koonce's and Pradia's statements, detectives obtained a warrant for applicant's arrest. During a consensual search of Nolan's house, investigators found a shotgun hidden between the mattress and box springs of applicant's bed.

Applicant, who left Houston on the day after Koonce gave his statement, remained at large. HPD detectives were unable to ascertain applicant's whereabouts until May 2, 1980, when they received a tip that he could be found at his grandmother's residence in Louisiana. On May 5, 1980, ten days after the offense, Louisiana authorities arrested applicant at his grandmother's house pursuant to a fugitive warrant. Incident to the arrest, Louisiana officers discovered a small suitcase containing a pistol and $612 in cash. Applicant, who previously had a full head of hair, had shaved his hair down to the scalp.

HPD detectives traveled to Louisiana, took applicant into custody, and returned him

---

[12] According to Koonce's statement, *see supra* note 11, applicant asserted that he shot McCarble because he believed that McCarble had been reaching for a gun.

to Houston. In Houston, applicant gave a written statement in which he admitted to participating in the robbery and to killing McCarble, although he asserted that McCarble's death was accidental.[13] According to applicant, during the screaming and panic that ensued after Scott cried out, he "suddenly fell backwards and the butt of the gun hit [his] arm and the gun went off." Applicant claimed that he later learned that the man in the booth had been shot. Applicant "[swore that he] was not trying to kill the old man and the whole thing was a[n] accident."

Applicant testified twice at his trial, first at a hearing on his motion to suppress his statement and later during the defense's guilt-innocence case-in-chief. The State cross-examined applicant on both occasions. At the suppression hearing, applicant denied giving or signing the statement. He asserted that one or more of the interrogating officers had beaten him when he refused to cooperate. Although he acknowledged that his signature was on the statement, applicant argued that his interrogators must have traced it from a blank piece of paper that he signed after being told that he would be released if he did so.

When he later testified in front of the jury, applicant again denied giving or signing the statement. Applicant testified that he was "quite sure" that someone who had been to prison before (as he had) would know better than to sign a confession. Applicant also denied any involvement in the offense, asserting that he was in Louisiana when the robbery and

---

[13] The record shows that this was not the first account of the offense that applicant gave to law-enforcement authorities. At applicant's 2001 punishment retrial, former Louisiana State Trooper Charles Webb II testified that he participated in applicant's May 5, 1980, arrest in Louisiana. Webb stated that, before Texas detectives arrived, he administered *Miranda* warnings to applicant and conducted a tape-recorded interrogation. Webb testified that applicant made an oral statement in which he admitted participating in the robbery, but denied being the shooter.

McCarble's death occurred. Applicant's eldest sister, Clara Jean Baker, also testified for the defense and corroborated applicant's alibi.

With the third perpetrator's identity at issue, the State presented rebuttal evidence that applicant had committed robberies at two other grocery stores just days before McCarble's murder. The earlier robberies occurred in a similar manner to the robbery in which McCarble died, with applicant wielding a shotgun and guarding the stores' courtesy booths while accomplices took money.

The jury found applicant guilty of capital murder. At the punishment phase, pursuant to applicant's stipulation, the State introduced his penitentiary packet. The penitentiary packet showed that applicant had four 1977 felony convictions (three for burglary of a habitation with the intent to commit theft and one for aggravated robbery) for offenses he committed in December 1976 and January 1977. Before accepting the stipulation, the trial court questioned applicant directly to determine whether his stipulation was voluntary, knowing, and intelligent.

Applicant's trial counsel did not call any witnesses or present any evidence at the punishment phase. Based on the jury's answers to the special issues, the trial court sentenced applicant to death.

### B. Applicant's Initial Direct Appeal

The trial court appointed Richard Bonner, one of applicant's trial counsel, to represent applicant on direct appeal. After receiving multiple extensions of time, Bonner filed an

appellate brief for applicant in July 1983.

Between October 1980 and July 1983, the trial court and this Court received numerous *pro se* motions and pleadings from applicant. The documents concerned applicant's desire to participate in his appeal; need for access to the record; growing displeasure with Bonner's appellate representation; and dissatisfaction with the trial court's failure to appoint another attorney or to allow applicant to represent himself on appeal pursuant to *Faretta v. California*, 422 U.S. 806 (1975). In October 1983, applicant's dissatisfaction culminated with his filing of a *pro se* petition for a writ of mandamus, in which he asked us to require the trial court to dismiss Bonner and to allow applicant to represent himself on appeal.

We remanded the case to the trial court for a *Faretta* hearing, which the trial court held on November 2, 1983. *See Ex parte Moore*, No. WR-13,374-01 (Tex. Crim. App. Oct. 5, 1983) (not designated for publication). George L. Walker, the 1980 trial judge, presided. Applicant advocated on his own behalf and presented five exhibits in support of his request to proceed *pro se*. Applicant's exhibits, which were admitted into evidence, included letters that he had written to Bonner regarding the appeal.[14] At the hearing, applicant read several of those letters aloud without any apparent difficulty. When it became evident that applicant was unaware that Bonner had filed a brief, the trial court recessed the hearing for an hour to

---

[14] In addition to correspondence between applicant and Bonner regarding the appeal, applicant's exhibits included correspondence between applicant, who is African American, and an attorney for the National Association for the Advancement of Colored People (NAACP) Legal Defense Fund regarding Bonner's many requests for additional time to file a brief; correspondence between the NAACP attorney and Bonner concerning Bonner's delay in filing an appellate brief for applicant; applicant's *pro se* pleadings in the trial and other courts; and a docket sheet from this Court showing multiple extension requests filed by Bonner and *pro se* motions filed by applicant.

allow applicant to review the pleading. When the hearing resumed, the trial court questioned applicant to ascertain whether he understood and was satisfied with the legal issues that Bonner had raised. Applicant responded rationally and coherently, although he struggled somewhat to explain Bonner's legal arguments to the trial court. At the hearing's conclusion, after applicant reaffirmed that he was willing to accept new appellate counsel, the trial court allowed Bonner to withdraw and appointed John H. Ward. After considering the claims raised by Bonner and Ward, as well as claims raised by applicant in a "Supplemental *Pro-Se* Brief For The Appellant," filed-stamped February 26, 1985, we affirmed the conviction and sentence. *Moore v. State*, 700 S.W.2d 193, 195 (Tex. Crim. App. 1985). The trial court set applicant's execution for February 26, 1986.

### C. Applicant's Previous State and Federal Habeas Proceedings

In February 1986, the Supreme Court denied applicant's out-of-time petition for a writ of certiorari and application for a stay of execution filed through new appellate counsel, Carolyn Garcia. *See Moore v. Texas*, 474 U.S. 1113 (1986). We subsequently denied applicant leave to file an application for an original writ of habeas corpus, denied his first application for a writ of habeas corpus filed pursuant to Article 11.07, and denied his accompanying motion for a stay of execution. *See Ex parte Moore*, No. WR-13,374-02 (Tex. Crim. App. Feb. 25, 1986) (not designated for publication) (original writ application); *Ex parte Moore*, No. WR-13,374-03 (Tex. Crim. App. May 19, 1986) (not designated for publication) (first Article 11.07 application).

After we denied the motion for stay of execution, applicant's counsel filed a petition for a writ of habeas corpus and motion for a stay of execution in federal district court. The federal district court granted a stay. In June 1987, after determining that applicant's petition contained an unexhausted claim, the federal district court dismissed applicant's petition without prejudice to refiling upon exhaustion of the claim in state court. *See Moore v. Johnson*, 194 F.3d 586, 601 (5th Cir. 1999).

On April 6, 1992, now represented by attorneys Rick G. Strange, Richard R. Fletcher, and Kristi Franklin Hyatt, applicant filed his second Article 11.07 application. In relevant part, applicant alleged that trial counsel rendered ineffective assistance by pursuing an alibi defense and, in furtherance of that defense, persuading applicant and his sister, Clara Jean Baker, to perjure themselves at the 1980 trial. Applicant further alleged that trial counsel were ineffective for failing to investigate, discover, and present mitigating evidence at the punishment phase. Relying in part on *Penry v. Lynaugh*, 492 U.S. 302 (1989), which the Supreme Court decided after his federal habeas petition's dismissal, applicant for the first time alleged that trial counsel should have discovered and presented evidence that he experienced a troubled childhood, as well as evidence that his intellectual functioning fell in the intellectually disabled or borderline range. To support the allegations, habeas counsel attached some of applicant's school and prison records, as well as affidavits executed in 1992 by three of applicant's siblings (Clara Jean Baker, Colleen McNeese, and Ronnie Moore) and applicant's brother-in-law, Larry Baker.

The school records attached to applicant's 1992 writ application included his academic, attendance, and cumulative health records, as well as scores that he obtained on the Iowa Test of Basic Skills (ITBS) given in third through sixth grades. The records also included the report of applicant's 1965 pre-kindergarten school medical examination. The examining doctor recommended psychological testing, commenting, "Child is very withdrawn—maybe retarded but most likely emotional problems."

The school records additionally included two IQ scores. In 1971, when he was twelve years old and in fifth grade, applicant obtained an IQ score of 77 on an Otis-Lennon Mental Abilities Test (OLMAT). When he was thirteen years old and in sixth grade, applicant was referred to Marcelle Tucker, M.Ed., for a psychological evaluation because he was performing below grade level, was withdrawn, and took no part in class unless called upon. In her report, Tucker stated that, on January 24, 1973, she gave applicant a Wechsler Intelligence Test for Children (WISC) and two tests of perceptual-motor coordination, specifically, a Bender Visual Motor Gestalt (Bender Gestalt) test and a Goodenough Draw-a-Man test.[15] Tucker reported that applicant obtained a full scale IQ score of 78 on the WISC and "mental age" scores of eight years, eleven months on the Bender Gestalt and nine years, six months on the Goodenough.

Tucker noted in her report that applicant was then attending his third elementary

---

[15] Witnesses variously refer to the Goodenough Draw-a-Man test administered to applicant by Tucker in 1973 (sixth grade) as "the Goodenough," "the Draw-a-Man," and "the Draw-a-Person." For consistency, we refer to the test as "the Goodenough." We note that the record shows that applicant also took a Goodenough test in first grade. Unless otherwise specified, references to "the Goodenough" in this opinion refer to the 1973 test.

school. In describing applicant's appearance and test behavior, Tucker described him as "nice looking" and "neatly dressed - very up-tight - did not use left hand even to hold paper when it skidded." In remarks concerning applicant's test results, Tucker again noted his test behavior: "During testing, [applicant] was extremely controlled. He made only the barest minimum of movements. His answers were given in as few words as possible." Tucker continued:

> The disparity between [the] "Information" (4) and "Comprehension" (8) [subtests] on the WISC indicated that perhaps this is a child who has not been taught, but who can learn.

> Low scores on the Bender and Goodenough [tests] seem to be negated by the average scores on "Block Design" (9) and "Object Assembly" (9) [subtests] on the WISC.

Tucker recommended that applicant stay in regular classes, but suggested that the school modify his program by using certain specific teaching techniques to strengthen his areas of academic weakness.

The Texas Department of Criminal Justice (TDCJ) records attached to applicant's 1992 writ application included a February 28, 1984 report of applicant's psychological evaluation by psychologist George Wheat. Wheat stated that he was conducting the review at the request of the Psychological Screening Committee to assist it with determining applicant's work-capable status.[16] Wheat stated that applicant self-reported "fairly regular

---

[16] In anticipation of the 2014 evidentiary hearing, the State filed applicant's complete TDCJ records. Those records included a Psychological Review Committee report of its January 11, 1984, interview with applicant, who was then twenty-four years old, to determine his work capability. The report and associated test forms reflected that applicant had been preliminarily screened with a psychological interview; an abbreviated Wechsler Adult Intelligence Scale-Revised (WAIS-R), on which he obtained an estimated full scale IQ score of 71; and a Minnesota Multiphasic

[past] employment as [a] construction laborer and clothing sales clerk." Wheat also noted that applicant was neatly dressed and exhibited no hesitancy in answering questions. He stated that applicant's responses "were appropriate to his 9th grade educational level and indicated [an estimated full scale] IQ of 71." Wheat concluded that applicant was work-capable.

The TDCJ records attached to applicant's 1992 application also showed that, in January 1989, following an internal quality-assurance audit, applicant was given a complete WAIS-R by a TDCJ psychologist. Applicant, who was thirty years old at the time, obtained a full scale IQ score that was reported as "not [falling within the] retarded range." The record currently before us shows that applicant obtained a full scale IQ score of 74 on the 1989 WAIS-R.

The habeas court held an evidentiary hearing on April 23, 1993, to address applicant's ineffective-assistance allegations. Judge Carl Walker Jr. presided. Dr. Robert J. Borda, a clinical neuro-psychologist, reviewed applicant's school and TDCJ records and testified for applicant. Borda stated that applicant's scores on the 1973 WISC and 1989 WAIS-R fell within the borderline range of intelligence (70–79) but asserted that applicant's "mental age"

---

Personality Inventory (MMPI), a personality test, which "revealed a valid profile which was consistent with significant probability of psychiatric disturbance. [Two-point-high] scale elevations were found on the psychotic scales." Based on its interview with applicant and his MMPI result, the committee found that applicant was "not psychologically clear" and ordered "[a] formal psychological and psychiatric work up." Wheat's evaluation followed.

at the time of the offense was no greater than fourteen years.[17]  Borda further asserted that applicant's failure to reach for falling papers during Tucker's 1973 WISC testing was unusual and consistent with behavior sometimes seen in brain-injured people.  However, Borda acknowledged that the records he reviewed did not mention a head injury.

Despite his opinions regarding applicant's mental age at the time of the offense, Borda did not purport to diagnose applicant as intellectually disabled.  Borda testified that IQ tests were developed to measure a person's potential to succeed in an academic setting and acknowledged that someone who obtained IQ scores in the borderline range of intelligence might well be capable of functioning successfully in the everyday world.  On cross-examination, the State asked Borda whether applicant was capable of formulating complex arguments concerning his trial representation.  Borda testified that, based on the documents he had reviewed, he "[saw] nothing that would indicate that [applicant] has really severe deficits in communication skills.  I think he's . . . able to communicate adequately."

Applicant's sisters, Clara Jean Baker and Colleen McNeese, and his brother-in-law, Larry Baker, also testified at the 1993 evidentiary hearing.[18]  They testified that applicant's father, Ernest Moore Jr. ("Junior"), was a neglectful, physically and verbally abusive alcoholic who beat his wife, Marion, and their nine children, and threw applicant out of the

---

[17]  At the 1993 hearing, Borda testified that "[m]ental age is the individual's intellectual functioning at any particular point in time referenced to what would be the average performance for a given age."  He stated that IQ scores were originally defined as a person's "mental age divided by the chronological age in months typically times 100."

[18]  To distinguish Clara Jean and Larry Baker, we refer to them by their first names.

family home when he was fourteen years old.

Clara Jean testified that applicant would watch their parents when they fought, which was often. Clara Jean asserted that applicant's observation made Junior angry and caused him to beat applicant. Clara Jean stated that Junior also beat applicant because applicant tried to protect the other children.

McNeese asserted that, although Junior beat her and her other brothers, he beat applicant the most. She testified that Junior threw applicant out of the house because applicant could not spell and Junior thought he was stupid.[19] McNeese stated that, after applicant was thrown out of the house, she and her siblings would sneak food to him at night until Junior discovered what they were doing and made them stop. McNeese acknowledged that Junior also forced her and her other brothers to leave home.[20]

Larry, who lived next to the Moore family as a teenager, stated that he had seen Junior strike applicant, as well as two of applicant's brothers. Larry testified that he could otherwise tell that applicant was suffering from some sort of physical abuse because applicant had bruises and appeared hungry, haggard, and unrested. Larry said that applicant was generally secretive about the abuse and reluctant to discuss his family situation, but he did talk to Larry

---

[19] Although Ronnie Moore, the youngest of applicant's brothers, executed an affidavit in 1992 in support of applicant's ineffective-assistance claims, he did not testify at the 1993 hearing. In his 1992 affidavit, Ronnie stated that Junior forced applicant to leave home at age fourteen because applicant told Junior to stop beating their mother.

[20] In her 1992 affidavit, McNeese stated that the Moore children grew up in extreme poverty and that there never seemed to be enough to eat. She asserted that she and applicant twice suffered ptomaine poisoning after scavenging food from the trash. McNeese stated that, after the food-poisoning incidents, applicant solicited odd jobs from neighbors when he and his siblings were hungry and bought food with the money he earned.

about it a couple of times.

Concerning the allegation that Bonner was ineffective as trial counsel by suborning perjury, Clara Jean testified that her family retained Bonner after learning his name from a young woman whom applicant was dating at the time. Clara Jean admitted that she lied at the 1980 trial when she testified that applicant was with her in Louisiana at the time of the offense. Clara Jean asserted that she lied because Bonner convinced her it was necessary for applicant to avoid the death penalty and because she wanted to help applicant.

Applicant also testified at the 1993 evidentiary hearing and was cross-examined. Regarding the allegation that trial counsel suborned perjury, applicant admitted that he signed the written statement offered against him at the 1980 trial and asserted that the statement recounted the offense exactly as it happened. Applicant stated that, although he also told trial counsel the truth about the offense, they advised him to testify at trial and deny giving the confession, which he did.

Applicant also testified that, after his arrest, he falsely told another inmate that he had a cache of jewelry. Applicant surmised that trial counsel heard the story because they spontaneously asked him if the story were true and wanted to know the jewelry's location and worth. Applicant stated that trial counsel implied that giving them the jewelry could increase his chances of a life sentence. To secure a good effort from trial counsel, applicant maintained the lie, telling counsel that the hidden jewelry was worth close to $1 million. Applicant initially avoided specifying a location for the jewelry by telling counsel that he did

not think it would be a good idea to disclose it to them. Eventually, applicant told counsel that the jewelry was at his grandmother's house in Louisiana.

Regarding his background, applicant testified that his father, Junior, was an alcoholic who physically abused him as a child and threw him out of the house permanently at age fourteen. Applicant stated that he was beaten and ejected from the family home because he tried to prevent Junior from beating Marion. Applicant stated that he needed to find a way to survive after Junior permanently threw him out of the house. Because it was difficult to simultaneously care for himself and attend school, he dropped out and became part of "street life." Applicant testified that he frequented pool halls and similar establishments; slept in the restroom or back of the pool hall; did not immediately try to live with anyone else because his siblings were helping him without their father's knowledge; obtained food by stealing it from stores; and later moved in with a friend.

Applicant testified that school had been difficult for him. As a student, he "really couldn't comprehend words as most kids would" and "it was difficult for [him] to read and write." Applicant asserted that he still had problems with reading and writing, but since being imprisoned, he had spent a lot of time studying and trying to develop himself. As a result, his skills had improved. When shown State's Exhibit 1, a typewritten *pro se* pleading titled, "Supplemental *Pro-Se* Brief For The Appellant," which was filed-stamped February 26, 1985, and a handwritten cover letter addressed from applicant to the Harris County Clerk, applicant testified that the brief looked familiar to him as a document that someone had

helped him prepare. He stated that he knew the contents and purpose of the document and that he had a part in researching it.[21]

Bonner testified at the hearing and denied the allegations made against him.[22] Bonner stated that applicant insisted before and throughout trial that he had an alibi and that counsel pursue such a defense. Bonner said that he spent a great deal of time talking with applicant during the course of his trial representation and that their conversations included discussions of trial strategy. Bonner never received the impression that applicant failed to understand the gravity of his situation or was unable to assist in his own defense; Bonner opined that applicant had assisted counsel very well.

On August 31, 1993, the habeas court entered findings of fact and conclusions of law and recommended that we deny relief on applicant's allegations. We determined that the record supported the habeas court's findings and conclusions and denied relief. *See Ex parte Moore*, No. WR-13,374-04 (Tex. Crim. App. Oct. 4, 1993). Meanwhile, the trial court set applicant's execution date for October 26, 1993.

On October 12, 1993, applicant filed his second petition for a writ of habeas corpus in federal court, raising the same claims that he advanced in his second Article 11.07 writ application. *See Moore*, 194 F.3d at 602. He additionally filed a motion for stay of

---

[21] At the 1993 hearing, McNeese acknowledged that applicant wrote to her from prison and that she would recognize his handwriting and signature. She identified applicant's handwriting in the cover letter.

[22] The record shows that applicant's other trial attorney, C.C. Devine, died shortly after applicant's 1980 trial and that, by the time of the 1993 evidentiary hearing, Bonner had been disbarred for reasons unrelated to his representation of applicant.

execution, which the federal district court granted. In 1995, the federal district court found that trial counsel performed deficiently at both phases of trial, but that applicant suffered prejudice only as to punishment. *See Moore v. Collins*, No. H-93-3217, slip op. at 32 (S.D. Tex. Sept. 29, 1995). In 1999, the Fifth Circuit Court of Appeals affirmed the federal district court's determination that applicant was entitled to punishment relief. *See Moore*, 194 F.3d at 622.

### D. 2001 Punishment Retrial

In February 2001, the trial court held a new punishment trial. The current habeas judge, Susan Baetz Brown, heard certain pretrial matters, but Judge Larry Fuller presided over jury selection and the evidentiary portion of the punishment retrial.

At trial, the State reintroduced the evidence that it had presented at the guilt-innocence and punishment phases of applicant's 1980 trial. It also introduced applicant's disciplinary reports for the period he was confined on death row before his original death sentence was vacated.

Those reports showed that, on June 24, 1983, after showering, applicant stopped at a cell to talk to another inmate and ignored three orders to return to his own cell. After refusing the third order, applicant told the reporting officer, "[Y]ou can't tell me what to do, come on out from behind those bars and make me get in my cell. You aren't man enough to put me down." During a later security check at applicant's cell, applicant told the officer, "[Y]ou get out from in front of my cell, you motherfucker, I wish these bars weren't here."

On September 23, 1983, while being let out for recreation, applicant stopped at four different cells to talk to other inmates and ignored eleven orders by the escorting guard to proceed.

On January 23, 1984, applicant ignored orders to stop talking to another inmate and enter the day room. On March 9, 1984, applicant failed to report to his assigned work. When confronted, applicant falsely stated that an officer had given him the day off.

On April 18, 1986, applicant was found to possess a large quantity of pills for which he did not have a prescription. On April 23, 1986, when ordered to shave, applicant told the guard that everyone knew that he had a shaving pass. When ordered to show the pass, applicant refused. On October 3, 1986, while giving inmates their meal, a guard ordered applicant to move from a bench in the day room to a table. Applicant stood up, stated that he "just had to fuck with somebody," and then refused an order to return to his bunk.

On January 3, 1987, applicant refused an order to get a haircut, stating, "I'm not going to get one." On January 22, 1987, applicant was among a group of inmates brought to the day room and told to sit down facing the wall. Applicant created a disturbance by jumping up and yelling, "[F]uck this, we don't have to do this," and trying to get the other inmates in the day room to join him. When ordered to sit, applicant repeated, "No! [W]e don't have to do this!" As the guard approached him, applicant returned to the spot where he had been sitting but refused to sit down. Ultimately, the guard grabbed applicant by both arms and placed him face down on the day-room floor.

On November 17, 1987, a prescription-only pill was found in applicant's cell,

wrapped in toilet paper. Applicant did not have a prescription for the medication. On June 23, 1988, applicant refused an order to shave, citing a medical condition.

On September 6, 1990, a stinger (an altered electrical cord used to boil water) was found in applicant's cell. On August 12, 1992, applicant, who was working as a death-row porter, refused an order to clean up a spill in the main hallway. He stated that it was not his job because he was a death-row porter, not a hall porter. On March 30, 1995, applicant was found to possess matches and rolling papers, which inmates were prohibited from having.

Applicant did not testify at his punishment retrial. However, the defense called nine of applicant's family members to testify about applicant's background and the changes they had seen in applicant since he had been imprisoned on death row.

Marion Moore, applicant's mother, testified that the family had financial problems. She stated that she worked forty hours per week outside the home when applicant was small and that her husband, Junior, worked construction jobs on and off. She testified that Junior developed a drinking habit and would become frustrated with the children when he had been drinking. Marion testified that, in December 1971, applicant was hit in the head by a brick when he was on a school bus and that he received medical treatment for the injury a few days later.

Larry Baker gave testimony similar to that which he gave at the 1993 evidentiary hearing concerning Junior's verbal and physical abuse of the Moore children. Regarding Junior's verbal abuse, Larry elaborated that Junior treated the male Moore children

differently than the female children. Larry stated that Junior would tell all of his sons that they were "worthless" and "no good."

When asked to describe what kind of person applicant was between the ages of thirteen and seventeen, Larry testified that applicant was athletic, had a dog and "really had a special relationship with it," and "was a quiet kind of guy sometimes." Larry asserted that he had seen changes in applicant since that time. Larry stated that he "felt initially that [applicant] was not as intelligent as he ha[d] displayed lately." Larry said that applicant "shows advance [sic] toward intelligence. He reads a lot. His handwriting is excellent. His grasp of vocabulary has improved considerably. His presentation of himself is much better."

McNeese testified that the Moore family moved a lot and that they had been evicted on one occasion. As to Junior's physical abuse of applicant, McNeese gave testimony similar to that which she gave at the 1993 evidentiary hearing. She again acknowledged that Junior beat all of the children, but testified that Junior treated applicant differently from her other brothers and said that applicant did not seem like he was Junior's son.

McNeese also testified that she and applicant attended the same schools when they were young. She said that they first attended Atherton Elementary, at which the student body was predominately black. When applicant was about twelve, as part of a racial integration effort, they were bussed to Scroggins Elementary. McNeese testified that "it was really hard for us to attend [Scroggins] because the people didn't want us there." She testified that, when they were first attending Scroggins, applicant was hit in the head with a brick because

the other students wanted them off the bus. She said that applicant missed school because of the brick incident.

McNeese, who is about eleven months younger than applicant, testified that she and applicant were placed in the same classroom at Scroggins so that she could help him. McNeese stated that applicant did not respond to the teachers, who did not realize that he could not read, and he would not participate in anything. McNeese attributed applicant's behavior in class to the fact that he did not understand what was going on. She said that she overheard teachers discussing applicant and asking each other whether he were intellectually disabled or had a hearing problem. McNeese testified that when she was doing seventh-grade-level work, the teachers would give applicant third-grade-level work to do, and she would stay after class to help applicant with it.

McNeese testified that Hester House, a community center serving Houston's Fifth Ward, was a place where she and her siblings escaped from their situation. McNeese thought that applicant did better at Hester House than at school because "[i]t was the only place where he could really go without my dad messing with him." McNeese testified that applicant learned to swim at Hester House, became very good at swimming and enjoyed it, entered into swimming competitions, and at age thirteen, won an award for saving a deaf and mute boy from drowning.

Paravena Richardson, applicant's cousin, testified that she spent a lot of time in the Moore household as a child and attended school with applicant and some of his siblings.

Richardson stated that they first attended Atherton Elementary but then were bussed to Scroggins Elementary, at which the student body was primarily Hispanic. Richardson stated that she was in the same classes with applicant at Scroggins and that the Hispanic students there treated him badly—calling him names, picking fights, and once hitting applicant in the side of the face with a brick. Richardson testified that, as a result of his treatment by the Hispanic students, applicant was withdrawn in class and kept to himself.

Richardson said that she had seen Junior, who was quite controlling and could be set off by the most minute things, become physically violent with his children. Richardson stated that Junior targeted applicant more than the other boys. Richardson did not know why and noted that Junior and applicant's older brother, Charles, had almost as poor a relationship.

Applicant's brother, Lonnie Moore, testified that he was a couple of years younger than applicant. When Lonnie was ten years old, he attended Scroggins Elementary with applicant. Lonnie testified that he and applicant were part of a group of students who were bussed to Scroggins to integrate it. Lonnie was aware at the time of racial tensions at Scroggins and of things that happened to applicant there.

Lonnie stated that his parents treated him and his younger siblings differently than they treated the older children. Unlike the older children, Lonnie and his younger siblings had to stay in the backyard. They were not allowed to play out in the streets with friends and would be watched over by their eldest sibling, Clara Jean. Lonnie testified that applicant and

his other older brothers were not subject to the same restrictions. Lonnie saw Junior physically abuse applicant when applicant stood up for what he thought was right, which included protecting their mother from Junior's abuse. Lonnie testified that, due to the tension between applicant and Junior, applicant was not comfortable or able to relax at home.

Lonnie testified about gifts that applicant had made in prison for him, which included: clocks in the design of a church and a church cross, a jewelry box, and picture frames.[23] Lonnie further testified that he had seen a big change in applicant since applicant had been on death row. Lonnie thought that applicant had gained direction and developed compassion, and noted that they now talked a lot about religion.

Applicant's brother, Johnny B. Moore, testified that he was four years younger than applicant. Johnny saw Junior hurt applicant, sometimes for no apparent reason, and at other times, because applicant was trying to stop their parents from fighting. When applicant was still living in the family home, applicant earned money by cutting grass. When the children did not have enough to eat, applicant would use his earnings to help feed his siblings.

Ronnie Moore, the youngest of applicant's brothers, testified that when their parents were gone, the older children—primarily applicant, Clara Jean, and McNeese—took care of the younger children. Ronnie stated that there was often no food in the house. On one occasion when applicant and McNeese were in charge of the younger children and there was no food, Ronnie saw applicant and McNeese eating from the neighbors' trash cans. He

---

[23] Photographs of these items were admitted into evidence.

recalled that they contracted food poisoning.

Ronnie further testified that applicant worked on the weekends for a man named Collier, who mowed lawns, and that applicant also worked in a rest home. Ronnie testified that applicant used his earnings to help support the family. Applicant gave Ronnie money for lunch and their mother money for bills. Ronnie testified that, in addition to beating applicant, Junior would call applicant "stupid" and "dummy."

Cloteal Morris, applicant's mother's cousin, testified that applicant was quiet and well behaved as a young boy, but he was not an open child and never talked very much. She stated that applicant had written her beautiful letters from prison about church and religion. Alice Moore, applicant's maternal aunt, testified that applicant was quiet as a child and "seemed like a regular kid." She stated that applicant wrote letters to her from prison and described them as "just normal letters."

The defense also called Jo Ann Cross, a London solicitor. Cross became acquainted with applicant through her mother, who began corresponding with applicant in 1990. Cross began corresponding with applicant in 1993. Cross testified that applicant's writing style, spelling, grammar, and use of language had all improved during the period of their correspondence and that it continued to improve.

Cross further stated that applicant now showed "a greater deal of understanding of all sort of issues, be it culture issues [or] politics" than he had at the beginning of the correspondence. Cross explained that she had arranged for applicant to receive newspapers

and articles and that they had discussed these materials in their correspondence. She testified that applicant had "absolutely" demonstrated an ability to understand and comprehend the events that she was discussing with him and that he had shown sympathy and happiness for her when it was appropriate. After her mother died in 1996, applicant wrote Cross a very moving letter about her mother's death. Applicant had also made and sent gifts for Cross and her mother, including a jewelry box with a prayer for peace inlaid in the lid and a musical jewelry box.

TDCJ guards testified that, while on death row, applicant obtained the status of a staff-support inmate, which allowed him to apply for jobs within the prison and enjoy certain privileges during his non-working time. Applicant's records showed that he successfully applied for jobs as a wing porter and barber and that he also worked in the shoe and garment factories.

A Harris County Jail guard, Jeff Dixie, testified that, while applicant had been in jail awaiting the retrial, he had seen applicant reading a newspaper. Another Harris County jailor, Kenneth Wayne Young, testified that he had written a motivational book, "Wakeup Call," and that the chaplain had given a copy to applicant. Young testified that applicant read "all the time" and that applicant introduced newly arrived or troubled jail inmates to Young's book.

The defense also called two expert witnesses to testify, Dee Dee Halpin and Bettina Wright. Halpin was an educational diagnostician with a master's degree in special education.

Wright was a clinical social worker who held a bachelor's degree in psychology and a master's degree in social work.

Halpin stated that, at the defense's request, she reviewed applicant's educational records. These records reflected applicant's attendance, conduct and academic grades, academic achievement test scores, and IQ test results.[24] Halpin testified that applicant attended Atherton Elementary School from kindergarten through fourth grade. She stated that there was a recommendation during the kindergarten year that applicant receive psychological testing because he was very withdrawn. Although the person who recommended testing commented that intellectual-disability was a possible cause for applicant's presentation, that person thought that emotional problems were the more likely explanation.

Halpin testified that applicant was promoted to first grade, but he made very poor grades that year, especially in all of the language areas, he tested "poorly" in reading and math readiness, and his eye-hand coordination was immature.[25] When applicant was retained a year in first grade, his grades remained weak, with the only significant change being that his conduct grade dropped from "good" to "needs improvement." When applicant was socially promoted to second grade at age eight, his grades remained about the same.

---

[24] Halpin prepared a written summary of applicant's educational records, which was admitted into evidence at the punishment retrial.

[25] Halpin's written summary indicated that applicant took a Metropolitan Readiness Test (MRT) and a Goodenough Draw-a-Man test in first grade, obtaining a "low normal" result on the MRT and an "immature" result on the Goodenough.

Applicant attended summer school and was promoted to third grade, where his poor grades continued and his conduct dropped to "unsatisfactory," the lowest possible conduct grade. Halpin testified that applicant's score that year on the Iowa Test of Basic Skills (ITBS), a group-administered standardized achievement test, indicated that he was a third grader performing at a second-grade level.

Halpin testified that applicant was promoted to fourth grade, but his grades remained poor, and he continued to perform below grade level on the ITBS. He was promoted "on appeal" to fifth grade and began attending a new school, Scroggins Elementary. Applicant's grades improved from Fs to Ds, and his conduct grades for that year showed significant improvement. When he took the ITBS that year, applicant's math score was within the average range, although his language score remained below average. When noting applicant's result on the OLMAT that applicant took that year (77 IQ), Halpin described the OLMAT as a group-administered IQ test.

Halpin stated that applicant attended a third elementary school for sixth grade. She testified that attending three different schools within three years would be difficult for any child. Halpin explained that, in the era in which applicant attended school, the grade in which certain skills were taught often varied between schools. As a result, a student who changed schools frequently in that era might miss being taught certain skills. In addition, changing schools disrupted continuity in a child's learning and required the student to make a social adjustment to the new environment.

Halpin stated that applicant's ITBS scores for sixth grade showed him to be performing two years below grade level. Applicant's records also showed that he took a Slosson Intelligence Test that year, at age thirteen.[26] Halpin testified that applicant "came out with a mental age of seven-and-a half and so his IQ was 57," which fell within the intellectually disabled range. But Halpin noted that the Slosson is an individually administered IQ test that strongly favors verbal skills. She asserted that a student with any kind of language difficulty would typically perform poorly on the Slosson and that applicant had consistently shown such language difficulties. In addition, Halpin testified that a notation in applicant's records stated that his Slosson IQ score of 57 was "minimal." Halpin explained that a "minimal" notation typically meant that the test administrator felt that the person actually functioned at a higher level.

Halpin was additionally skeptical of applicant's score on the Slosson because he subsequently took the individually administered WISC, which separately assessed verbal and nonverbal abilities. Within the overall IQ score of 78 that applicant obtained on the WISC, he obtained a verbal IQ score of 77 and a nonverbal or performance IQ score of 83. Halpin testified that, according to his school records, applicant remained in a regular classroom following the WISC testing.

Halpin testified that she had also reviewed a letter that applicant had recently written. She stated that, although the letter contained some errors, the language was "certainly

---

[26] The records that applicant submitted with his 1992 writ application did not mention a Slosson Intelligence Test.

coherent," "fairly complex," and "adult[-]like." Based on all the materials she reviewed, Halpin opined that applicant functioned in the low-average range of intellectual functioning and that he "definitely had some ability to learn that wasn't tapped early in his school years."

Wright testified that she had reviewed applicant's educational records and Dr. Borda's 1993 evidentiary hearing testimony. She also interviewed applicant twice, for a total of four hours. Wright concluded that applicant "was nowhere near retarded." She opined that applicant had an average IQ and that his ability to learn was "very intact."

Wright attributed applicant's difficulties in school to undiagnosed learning disabilities and emotional problems. She opined that his emotional problems stemmed from his learning disabilities, academic failure, and self-described "scary" childhood. She concluded that the quietness and constrained movement noted in applicant's records were due to his fear rather than to any diminished intellectual functioning. She explained that applicant was a very vigilant and watchful child who carefully assessed situations before acting.

Wright testified that applicant's drug use exacerbated his difficulties in school. Applicant told Wright that he began to use drugs in fifth grade to "escape the pain." He began by using marijuana. By the time he was of junior-high and high-school age, Wright testified, applicant was using marijuana, alcohol, amphetamines, tranquilizers, and whatever else he could obtain.

In closing argument, defense counsel emphasized applicant's background. Defense counsel asserted that applicant did so poorly in school that he "was considered to be possibly

[intellectually disabled]." But counsel asserted that "we learned later from the experts and other people who looked at [applicant's school records] that he wasn't really [intellectually disabled] at all, he was capable of learning." Counsel argued that "mostly what [applicant's] young life was about" was "lack of food, violence in the home[,] and one failure after another in school. . . . It was a cycle of violence in which there was no peace and no safety in the home." Counsel asserted that, in addition to physically abusing applicant, Junior Moore emotionally abused applicant by conveying the idea that he "wasn't any good, he wasn't smart, [and] he couldn't learn." Counsel argued that applicant "[was] not retarded, he was just treated like somebody that was retarded" and that it was not until applicant "[went] to prison[,] away from his family environment that [he was] actually safe enough to be able to learn and grow and become the kind of person that he could have become had he come from a safe environment."

The trial court charged the jury pursuant to Article 37.0711. On February 14, 2001, in accordance with the jury's answers to the special issues, the trial court again sentenced applicant to death.

### E. Direct Appeal from 2001 Punishment Retrial

Robert Morrow, applicant's punishment-retrial counsel, also represented applicant on the automatic direct appeal to this Court. *See* Art. 37.0711, § 3(g). On August 20, 2002, Morrow filed a brief on applicant's behalf. On the same date, he filed "Appellant's Motion To Stay Proceedings Under [*Atkins*] Pending Legislative Action, As An Alternative To Relief

Requested In Appellant's Brief." Despite having argued at the punishment retrial that applicant was not intellectually disabled and having presented the testimony of two experts to support that theory, Morrow now asserted that applicant "ha[d] a strong claim of [intellectual-disability]" under the June 2002 Supreme Court opinion in *Atkins*. Morrow urged us to stay applicant's direct appeal until the Texas Legislature enacted legislation to implement *Atkins*'s mandate. We denied the motion on September 11, 2002.

On October 3, 2002, applicant filed a *pro se* "Motion for Leave to File Appellant's [*Pro Se*] Supplemental Brief." In the motion, applicant acknowledged that he was not entitled to hybrid representation, but stated that he wished to file a supplemental *pro se* brief to raise an additional point of error. In his *pro se* supplemental brief, applicant argued that Article 37.0711 was unconstitutional because it implicitly placed the burden on the defendant to show that sufficient mitigating factors exist to warrant a life sentence rather than death. We denied applicant's motion on October 4, 2002, and later affirmed his sentence. *See Moore v. State*, No. AP-74,059, slip op. at *2 (Tex. Crim. App. Jan. 14, 2004) (not designated for publication), *cert. denied*, 43 U.S. 931 (2004).

## II. Current Habeas Proceedings

### A. Applicant's Application and Supporting Exhibits

On June 17, 2003, through appointed habeas counsel Stephen Morris, applicant filed his current application pursuant to Article 11.071. In support of his request for an evidentiary hearing on his *Atkins* claim, applicant attached affidavits executed in 2003 by Gina Vitale,

a social worker and his mitigation investigator, and Dr. Richard Garnett, a clinical psychologist. Vitale and Garnett each asserted that there was sufficient evidence of applicant's intellectual-disability, as defined in the tenth (2002) edition of the AAMR Manual or the DSM-IV, or both, to warrant an evidentiary hearing.[27] According to their affidavits, although Vitale interviewed applicant's relatives, neither Vitale nor Garnett personally assessed applicant. Instead, they based their opinions on their review of Vitale's interviews with applicant's family; affidavits and interview notes compiled by applicant's previous defense team; and some of applicant's records. Neither Vitale nor Garnett actually diagnosed applicant as intellectually disabled.

Vitale discounted applicant's 77 IQ score on the OLMAT, describing that instrument as a state-mandated, group-administered IQ screening tool, and she emphasized the 57 IQ score that he obtained on the Slosson. Vitale acknowledged applicant's WISC score (78 IQ), but asserted that his mental age scores on the concurrently administered Bender Gestalt and Goodenough tests reflected much lower IQ scores of 67 and 71, respectively.[28]

Garnett stated that the OLMAT is a group test that requires one to read. Due to evidence of applicant's inability to read, Garnett questioned the validity of applicant's OLMAT score. Garnett also asserted that applicant obtained a 67 IQ score on the Bender

---

[27] The definitions of intellectual-disability contained in the tenth edition of the AAIDD Manual and the DSM-IV do not require that an individual's adaptive behavior deficits be linked or "related" to deficiencies in intellectual functioning. *See* INTELLECTUAL-DISABILITY 8; DSM-IV 37.

[28] According to her affidavit, Vitale arrived at these IQ scores for the Bender Gestalt and Goodenough tests by comparing applicant's mental-age score on those instruments against his chronological age at the time of testing.

Gestalt and a 72 IQ score on the Goodenough test that he took in conjunction with the 1973 WISC.

### B. Applicant's *Pro Se* Requests to Waive Further Appeals

The State filed an original answer in December 2003, followed by a supplemental answer in January 2004. On June 23, 2005, direct appeal counsel Morrow wrote to the current habeas judge, stating:

> It is my understanding that you recently received a request from [applicant] to discontinue his appeals and or [sic] pending writs. I received the same request. However, immediately after that, I received instruction from [applicant] that he no longer wishes to withdraw his writs or appeals. [Applicant] is dealing with the stress of Death Row and was understandably upset when he wrote the first letter. [Applicant] wants to continue his post conviction efforts.

Despite Morrow's assertions, on October 3, 2005, applicant filed a "*Pro Se* Ex Parte Motion to Waive Further Appeal" in the trial court. Applicant correctly stated that he had been sentenced to death on February 14, 2001, after a new punishment trial; that the trial court had subsequently appointed Morrow to represent him on direct appeal; and that it had appointed Morris to prepare a postconviction application for a writ of habeas corpus. Applicant moved the trial court to dismiss Morrow and Morris, to find that he waived further appeals of his capital-murder conviction and death sentence, and to set his execution date.

On May 30, 2006, the current habeas judge held a hearing concerning applicant's *pro se* motion. Direct-appeal counsel Morrow appeared on behalf of applicant, who, by the parties' agreement, was not present. The court stated that, in response to applicant's 2005

letter and motion, it had ordered him moved from death row to the Harris County Jail for a psychological examination to determine his competency to withdraw his application. The court further stated that, as of the 2006 hearing date, applicant had been at the jail for sixty-nine days but had refused to speak with doctors. Therefore, the court said, no psychological examination could be completed. Counsel for both parties agreed to the court's factual recitation. Because no psychological examination could be completed, the court ordered applicant's habeas proceeding to continue, directed that he be returned to death row, and instructed Morrow to write to applicant to explain why the court could not proceed with the *pro se* motion.

### C. Applicant's Supplemental Filings in Support of His *Atkins* Claim

In 2009, current writ counsel, Pat McCann, substituted for Morris, who was permitted to withdraw. In late 2011, McCann filed a lengthy "Factual Supplement" in support of applicant's *Atkins* allegation. The Factual Supplement included documents that appeared to be notes taken by applicant's 1992 writ and 2001 punishment-retrial defense-team members, specifically, Kristi Franklin Hyatt, Anthony S. Haughton, Patrick Moran, and Jemma Levinson. The notes memorialized their interviews with applicant, various relatives, and Dr. Borda.

According to those notes, on November 14, 1991, applicant told Haughton that Junior Moore physically terrorized and abused applicant's mother and siblings just as badly as he did applicant; applicant was a slow learner who did not do well in school; and due to family

moves and racial integration efforts, he attended several different schools. Applicant said that, when he dropped out of school around age fifteen or sixteen, he could barely read and started living "a street life." He had his first drink at age thirteen, and before going to prison at age seventeen, he regularly abused alcohol and drugs. In junior-high school, he started smoking marijuana and taking 7 to 14 Quaalude pills per day, and he tried methamphetamine. Applicant also reported that, after his first stint in prison, he started cooking and injecting "preludes."[29] Applicant stated that he got stoned regularly, often combining preludes, marijuana, and alcohol.

According to the notes, in April 1993 (i.e., before the 1993 evidentiary hearing), Borda told Hyatt that he did not consider applicant intellectually disabled, although he believed that physical abuse, neglect, and substance abuse may have affected applicant's mental status at the time of the offense. Because applicant had never been tested for a personality disorder, Borda told Hyatt that he could not rule out schizophrenia or personality disorders. However, Borda said that he felt comfortable describing applicant as having at least below average intelligence, a learning disorder, and compromised social development. Borda believed that applicant had some sort of brain dysfunction, possibly from a frontal-lobe injury, which would result in a lack of impulse control and a diminished ability to think through the consequences of his actions. But Borda acknowledged to Hyatt that amphetamine abuse could cause "this personality defect."

---

[29] We understand "preludes" to refer to phenmetrazine. *See United States v. Green*, 246 F.3d 433, 434 (5th Cir. 2001).

The notes in applicant's Factual Supplement indicated that defense-team members interviewed applicant four times in 2000. Moran interviewed applicant in February and March of that year. During the interviews, applicant stated that his mother, Marion, would send him to look for Junior, who was often absent. Applicant would usually find Junior drunk and with another woman. Applicant observed that it probably angered Junior for applicant to find him in such a compromising position and that Junior may have beaten applicant harder than the other children to deter him from telling Marion.

Applicant stated that, after being permanently thrown out of the house, he could have stayed with nearby friends. But because applicant felt ashamed, he instead spent the first night in a neighbor's garage.

Applicant said that his earlier period of incarceration would show two disciplinary matters. One was for making gambling dice from paper and soap. The other was for fighting a bullying inmate named "Cadillac." Applicant recalled that he had been in the day room talking to an inmate who was known as an easy rape victim. When Cadillac began taunting both of them, a fight ensued. Applicant said that a guard who witnessed the incident corroborated his assertion of self-defense.

Jemma Levinson interviewed applicant twice in May 2000. According to her notes, applicant stated that he looked after his older brother, Charles, who sometimes got into trouble when drinking, and that he broke up fights between Charles and their brother Jessie. Applicant also said that it fell to him and his sister, Clara Jean, to look after the younger

siblings.  At school, applicant's sister, Colleen, told him that a boy was bothering her.[30]

Applicant told the boy to leave Colleen alone and fought with him.

Applicant described himself to Levinson as the kid in the neighborhood that everyone liked and recalled that he would clean houses and cut yards.  Applicant told Levinson that, when he was around eleven or twelve years old, he would sneak out of the house between 1:00 and 2:00 a.m. to see friends.  Applicant said that he lacked guidance and became attracted to "things on the street."

Applicant also stated that he did not do well in school, did not like it, and was frustrated by his inability to read or write.  To escape class, at first he would go to the school nurse, pretending to be sick.  He started skipping school in fourth grade, skipped school a few times in sixth grade, and by seventh grade, almost entirely stopped going.  Applicant told Levinson that he also started drinking in the seventh grade.

Applicant reported that, in seventh grade, he wanted to be a football or baseball player and tried out for school sports teams, but he had to stop playing when he ran over a wire hanger while mowing lawns and suffered a cut to his leg.  The hospital put a cast on his leg, which he ultimately removed himself because he was determined to walk on his leg. Applicant said that he met his first girlfriend at school and that he would sneak from his house at night to see her.  Applicant stated that he got into trouble at school for fighting and had a reputation for it, such that people wanted to fight with him.  Applicant thought that the

---

[30] This is the same Colleen McNeese who testified at the 1993 evidentiary hearing and the 2001 punishment retrial.

fights came about because he was shy and did not know how to communicate.

Applicant also told Levinson that he began hanging around the pool hall, where he learned to gamble and steal. Another guy around his same age showed him how to shoot pool, rob people, steal cars, and break into houses. Applicant told Levinson that he later began doing those things on his own.

Applicant further stated that he started injecting preludes when he was between fifteen and sixteen years old, but he later stopped because it scared him, and he knew that he would end up dead or doing something that he would regret. Applicant also stopped drinking alcohol after seeing the effect it had on him, but he continued smoking marijuana. Applicant reported that he paid for drugs with money that he made from stealing and selling cars, breaking into houses, and hustling pool.

Applicant also told Levinson that during his earlier period of incarceration, he made friends with an inmate named Swan. Applicant and Swan would stay out of the day room to avoid the fights that frequently occurred there. Instead, he and Swan would play dominoes elsewhere and applicant had a disciplinary report for one of those occasions. Applicant recalled that, around 1997, he went through "a bad period" on death row, during which all he did was sleep and gain weight. Applicant further told Levinson that he had ordered and read a book written by a jail officer.

The notes contained in applicant's Factual Supplement indicate that Moran and Levinson separately interviewed Clara Jean Baker in 2000. According to those notes, Clara

Jean reported that both of applicant's parents regularly beat all of the children except for her. Clara Jean recalled that, as applicant grew older, he would intervene when his parents fought, causing Junior to throw him out. Clara Jean said that applicant knew about Junior's many extramarital affairs and that Junior was always angry with applicant for catching him in infidelity. Clara Jean further stated that applicant and their brother, Jessie, would sneak out of the house. In his early years, applicant was quiet, shy, and did not spend much time with other people, but otherwise was happy, artistic, and always working. In summer, applicant would cut yards all day until Marion came home. Applicant liked wearing nice things and cared a lot about his appearance. Clara Jean recalled that applicant had a girlfriend at school named Robin, who was "very cute," and other boys envied him because of it.

The notes also indicate that Levinson interviewed Larry Baker in 2000. Larry reported that, as a child, applicant was "personable and impressionable, . . . a very good athlete," liked animals, was obedient, attended school, and "was just the same as the rest of us." Applicant trained the Moore family's dog and put on "shows" with the animal. The dog was very well trained and did whatever applicant said. Larry recalled that applicant followed clothing trends, was pleasant and well-mannered, and was always helpful, doing odd jobs and selling newspapers. He described applicant as enterprising and having a lot of friends. As they grew older, Larry started noticing changes in applicant's choice of associates and in applicant's attitude towards attaining things. Larry stated that applicant developed the attitude that he did not want to work his whole life and have nothing. Larry told Levinson

that applicant always looked neat and tidy, had good hygiene, and worked in a fish market and cut grass to buy his clothes.

### D. Appointment of Mental-health Experts

The current habeas court appointed mental-health experts for both parties in anticipation of the 2014 evidentiary hearing. Dr. Borda again assisted applicant, as did Dr. Shawanda Williams Anderson, a clinical neuro-psychologist, and Dr. Stephen Greenspan, a retired professor of educational psychology. Dr. Kristi Compton, a clinical and forensic psychologist, assisted the State. Before the hearing, habeas counsel filed Borda's affidavit and Anderson's "Forensic Neuropsychological Report."[31]

According to her report, on November 22, 2013, and December 6, 2013, over a period of four hours, Anderson conducted an initial diagnostic interview of applicant at TDCJ's Polunsky Unit and administered various neuropsychological tests to him. She thereafter interviewed applicant's family members for approximately two hours. On December 19, 2013, Anderson administered math subtests of the WAIS-IV and Wide Range Achievement Test-4 (WRAT-4) to applicant at the Harris County Jail, solely to determine his computational ability.

According to Borda's affidavit, he administered "a very limited test battery" to applicant on December 12, 2013. That battery consisted of three neuropsychological tests and one formal measure of IQ, a Raven's Colored Progressive Matrices (RCPM) test.

---

[31] Although habeas counsel described Anderson's report as a sworn affidavit, the report is not sworn or notarized.

Applicant obtained an IQ score of 85 on the RCPM.

On January 1, 2014, Compton conducted a six-hour assessment of applicant. After interviewing applicant about his personal history, she administered a Test of Memory Malingering (TOMM); a WAIS–IV; a Wechsler Memory Scales, 4th Edition; a complete WRAT-4; and a Texas Functional Living Scales, a test of adaptive functioning. Applicant obtained a full scale IQ score of 59 on the WAIS-IV.

### E.  January 2014 Evidentiary Hearing

Lonnie Moore, Colleen McNeese, Larry Baker, Mark Fronkiewicz, Borda, Greenspan, and Anderson testified for applicant at the 2014 evidentiary hearing. Through applicant's relatives, applicant again presented evidence of Junior's alcoholism and physical abuse, the family's limited financial means, and applicant's poor grades and reading difficulties.

Lonnie Moore testified that applicant was shy, quiet, and athletically talented as a child, especially at swimming, but he received poor grades in school and never read well. While still living with the family, applicant made money in the summer by cutting grass and helping a man with household projects. After being thrown out of the house, applicant worked at the Galleria for a place that sold sausages.

Lonnie and McNeese testified that their mother, Marion, cooked the family's meals on a hot plate and that the family did not have kitchen appliances such as a microwave oven. McNeese asserted that applicant did not know how to cook and did not help prepare food. However, McNeese and Lonnie both testified that only the female children were enlisted to

help Marion with meal preparation.

McNeese had testified at applicant's 1993 evidentiary hearing and his 2001 punishment retrial. She now remembered that the incident on the school bus, in which applicant was hit in the head with a brick, was a much more violent event than she had described in her prior testimony, asserting that it involved the bus being set on fire with Malotov-cocktail-like devices. McNeese also now remembered that, when applicant was in second and third grade, he could not tell a $1 bill from a $5 or $10 bill, was not allowed to go places by himself because he did not know how much change he was supposed to receive, and that she had to accompany him and handle the money. But McNeese acknowledged that, after he learned to read, applicant was able to distinguish the denominations on bills. McNeese also acknowledged that she had recently received letters from applicant and that his counting, reading, and writing ability had greatly improved since his imprisonment.

Through McNeese, habeas counsel attempted to show that Junior treated applicant more harshly than his siblings and that he did so because he perceived applicant to be intellectually disabled. Habeas counsel elicited testimony from McNeese that Junior was more cruel to applicant than to her other siblings. McNeese stated that Junior would call applicant "dumb," bend applicant's hand back, and whip him when applicant could not spell words or read on command. McNeese stated that Junior would get especially angry when school representatives visited the house to say that applicant needed help. McNeese testified that she was present when Junior "ran off" two such representatives, one of whom suggested

that applicant was intellectually disabled and needed a different educational setting. But McNeese stated that, at the time, she did not think that applicant was intellectually disabled. She also testified that, while applicant was "left behind" in school, he was always in regular classrooms. In contrast to her 2001 testimony that applicant functioned better and participated more when he was at places like Hester House, where Junior "could[n't] . . . [mess] with him," McNeese now asserted that applicant functioned the same whether Junior was present or absent.

Contrary to his earlier statements, Larry Baker now remembered that applicant was the slowest kid in a group of neighborhood boys who played sports together and that the other boys teased applicant for being a "dummy" until Larry made them stop. Larry testified that, when they played football, applicant could not follow verbal play instructions very well and that Larry had to diagram plays in the dirt for him. When they played baseball, he had to repeatedly tell applicant not to sling the bat. Larry also now remembered that people tried to take advantage of applicant, although he recalled that applicant would stand up for himself. Although Larry did not dispute his 2001 testimony concerning the advances applicant had made while in prison, he asserted that applicant's letters did not reflect a mature, thoughtful person with a normal state of mind.

Through the testimony of Mark Fronkiewicz, who acknowledged that he had an extensive criminal record and was on parole for murder at the time of the hearing, habeas counsel attempted to minimize the evidence of applicant's many *pro se* filings and other

writings included in the record. Fronkiewicz testified that he spent 1988 to 1993 on death row, before inmates received appointed counsel, and he worked as a writ writer, assisting inmates with legal and personal correspondence and writ preparation. Fronkiewicz stated that he recognized applicant from death row, but had never talked to him. Fronkiewicz asserted that David Harris was another writ writer on death row when Fronkiewicz was there. Fronkiewicz said that Harris sought his assistance on a *pro se* writ that Harris was preparing for applicant. Fronkiewicz remembered discussing applicant's case with Harris, but could not recall the date.

Borda, who acknowledged in his 2013 affidavit that forensic psychology "is not [his] specialty," testified that he now concluded that applicant met the criteria for a intellectual-disability diagnosis.[32] In forming his current opinion, Borda relied on: the records he reviewed in preparation for his 1993 evidentiary-hearing testimony; unspecified other medical records and affidavits provided by current writ counsel; unspecified other records, provided by unspecified other sources; "some family history"; Vitale's and Garnett's affidavits; Anderson's written report; the 2014 evidentiary hearing testimony of applicant's relatives; and his own "really . . . very, very brief" assessment of applicant in December 2013, which did not involve giving applicant "a [full scale] IQ test." Borda acknowledged that he did not know much about the offense and had not read applicant's confession or trial

---

[32] In his 2013 affidavit, Borda acknowledged that, in 1993, he concluded that applicant's intellectual functioning fell within the borderline range (an IQ of 70–79). But Borda asserted that he had since reviewed "extensive additional records." Borda also stated that the Flynn Effect was now widely accepted in the field of psychology and that the definition of intellectual disability had changed. Borda stated that these developments also contributed to his present opinion. *Id.*

testimony. Borda asserted that Vitale, Garnett, and Anderson had also diagnosed applicant as intellectually disabled.

Greenspan testified that he had a practice related to diagnosing intellectual disability in the forensic setting and that he performed the vast majority of his work for defense attorneys. In the roughly fourteen years since the *Atkins* decision, he had actually performed 10 to 12 clinical evaluations for intellectual disability and diagnosed intellectual disability in about two-thirds of them. Greenspan further testified that his clinical evaluations are not comprehensive because he focuses on the adaptive-deficits criterion. Greenspan stated that he taught IQ courses many years ago, but when working in his clinical capacity, at most, he only occasionally administers an IQ screening test. When determining whether a defendant satisfies the sub-average intellectual-functioning criterion, Greenspan relies on IQ test scores in the defendant's records. If none exist, then he requests that someone who is "more current" with IQ testing conduct such testing.[33]

Greenspan stated that he was testifying in applicant's case as a teaching expert and acknowledged never having met or communicated with applicant. Greenspan also acknowledged that he had not read the transcript of either of applicant's two trials. Although

---

[33] Greenspan acknowledged that, about a year before applicant's hearing, a federal judge issued an opinion in the Alexis Candelario Santana case, warning courts across the country to be cautious when reviewing Greenspan's testimony in future intellectual-disability cases. *See United States v. Candelario-Santana*, 916 F. Supp. 2d 191, 203–06 (D.P.R. 2013) (finding Greenspan to be "completely lacking in credibility" and stating that due to "bias[]," "considerable careless errors and slipshod disregard for the seriousness of the [court's] inquiry," continued "combative[ness] and evasive[ness] despite being admonished to be more forthcoming with his answers," "unwilling[ness] or [inability] to explain evidence that tended to refute his conclusions[,] and . . . little explanation . . . as to why he thought the government's experts' assessments were incorrect," Greenspan's testimony in an *Atkins* evidentiary hearing "suffered from extreme deficits" such that it "was fundamentally unreliable" and should be disregarded).

Greenspan did not offer a diagnosis, he testified that he had no reason to doubt Borda's intellectual-disability diagnosis and saw no basis for any other diagnosis.[34]

Anderson testified that current writ counsel originally asked her to determine whether applicant was born with a brain anomaly ("organicity") or evidenced a traumatic brain injury (TBI). To make those two determinations, Anderson reviewed unspecified school and medical records that current writ counsel provided, conducted an initial diagnostic interview, and administered various neuropsychological tests. Anderson testified that the neuropsychological tests she gave were not IQ tests.

Anderson stated that applicant's scores on the tests she gave indicated language deficits, slowed processing speed (but an intact memory), and problems with reasoning and judgment. Anderson testified that applicant's verbal memory score fell in the low-average range, reflected a weakness in his ability to acquire words (versus the ability to recall them once learned), and implicated his capacity to learn. She stated that applicant's scores on the executive-functioning assessments she gave were all in the "severe" range.[35]

Anderson testified that, after she conveyed her findings on organicity and TBI to

[34] Applicant elicited no testimony concerning precisely what records Greenspan reviewed in preparation for his testimony. In response to State questioning, Greenspan mentioned that he had been given roughly 200 pages consisting of "all the different pleadings." Greenspan, however, acknowledged that he did not review State's Exhibits 1–35, which were admitted into evidence before the beginning of Borda's testimony.

[35] Notably, Anderson stated in her report that applicant "reported that he used reading glasses for corrected vision, but did not have them at the time of testing. However, he reported being able to see all test stimuli accurately and without incident."

current writ counsel, he asked her to review the criteria for intellectual disability.[36] Anderson testified that she has made intellectual-disability determinations at least a few times in her practice. Anderson stated that, in making her intellectual-disability determination, she did not conduct any further evaluation except for a two-hour group interview of applicant's relatives. Anderson opined that applicant would meet the DSM-IV's and AAIDD's criteria for intellectual disability.[37]

Jerry LeBlanc and Compton testified for the State at the 2014 evidentiary hearing. LeBlanc testified that he had worked at the Polunsky Unit's commissary for fourteen years and and personally dealt with the commissary on a daily basis. LeBlanc explained the procedure by which death-row inmates request commissary items, described the kind of mathematical computations required to successfully complete a commissary form, and described his interactions with applicant regarding commissary transactions.

While looking at applicant's commissary records, LeBlanc testified to specific, recent

---

[36] At the hearing, Anderson did not state what conclusions she drew, if any, concerning whether applicant was born with a brain anomaly or suffered a TBI.

[37] In her report, Anderson stated:

It seems [applicant] exhibited developmental and intellectual delays early in his life that were significant enough for him to require consistent monitoring and elicit help from his teachers. These deficits were demonstrated much prior to age 18, which would satisfy criteria for a formal diagnosis of [intellectual disability]. Adaptively, he had some abilities as they relate to self-care, motor skills, and daily living. However, he had equally as many deficits in the adaptive domains which primarily fall under socialization, communication, and cognition. . . .

Taking into account the records reviewed, prior intelligence test findings, and [applicant's] performance on more stratified and task-specific neuropsychological tests, he more likely than not meets full criteria for [intellectual disability]; and this clinician would be justified in assigning said diagnosis.

examples of applicant having correctly computed multiple-unit order totals and having composed orders that came within 5¢ of the $85 limit. In one example, applicant used his funds to purchase fifteen postage stamps. LeBlanc also noted two examples of applicant having requested substitute items (one being a request for aspirin or dental floss in place of ibuprofen). LeBlanc testified that he did not help applicant complete commissary forms, and to his knowledge, no one else did. LeBlanc asserted that the commissary's price list changed frequently and that, although there was another cell adjacent to applicant's, the unit moved death-row inmates frequently, and thus, applicant did not have the same neighbor for significant periods.

LeBlanc additionally testified about his interactions with applicant regarding commissary transactions. LeBlanc stated that he and applicant had discussed what the commissary carried and whether it had correctly filled applicant's order. When the commissary had charged applicant for undelivered or damaged items, applicant had noticed, brought it to LeBlanc's attention, and been able to discuss the discrepancy or damage. LeBlanc had never received the impression that applicant was unable to understand what was going on with his commissary order or that he was unable to respond to LeBlanc's questions.

Compton stated that she had testified as an expert over seventy times and had conducted over 3,000 forensic evaluations, with about 50% of her work having been directly for the courts, 40% for defense attorneys, and 10% for the State. In preparation for her testimony, Compton reviewed applicant's school records; past psychological testing results;

TDCJ records (including commissary and disciplinary records); transcripts from applicant's 1980 trial (including applicant's testimony), 1983 *Faretta* hearing, and 2001 punishment retrial (including Halpin and Wright's expert testimony); letters from applicant to his attorney and others; motions filed by applicant; and recent photographs of items inside applicant's cell. Compton also personally assessed applicant by interviewing him and administering standardized tests, including effort tests. Compton additionally attended the entire evidentiary hearing and listened to the other witnesses' testimony.

Compton testified that the data she reviewed did not support an intellectual-disability diagnosis. Based on applicant's Flynn-Effect-adjusted scores on IQ tests that she considered valid, Compton concluded that there was a greater probability than not that applicant's intellectual functioning fell within the borderline range. But Compton noted that, when the standard error of measurement was applied to the mean of his valid, Flynn-Effect-adjusted IQ scores, the lower end of the scoring range could dip into the mild intellectual-disability range. Nevertheless, Compton opined that applicant's level of adaptive functioning had been too great, even before he went to prison, to support an intellectual-disability diagnosis.

After receiving the habeas court's findings of fact and conclusions of law recommending that we grant relief on applicant's *Atkins* claim, we filed and set the case to consider that allegation.

### III. Analysis

To prevail on the allegation that he is intellectually disabled for Eighth Amendment

purposes and, therefore, exempt from execution, applicant must prove by a preponderance of the evidence that (1) he suffers from significantly sub-average general intellectual functioning, generally shown by an IQ of 70 or less; (2) his significantly sub-average general intellectual functioning is accompanied by significant and related limitations in adaptive functioning; and (3) the onset of the above two characteristics occurred before the age of eighteen. *See Cathey*, 451 S.W.3d at 9; *Sosa*, 364 S.W.3d at 894*; Briseno*, 135 S.W.3d at 7.

## A. Significantly Sub-average General Intellectual Functioning

Applicant has failed to prove by a preponderance of the evidence that he has significantly sub-average general intellectual functioning. The IQ scores before us are: a 77 IQ score obtained by applicant in 1971 (age 12) on the OLMAT; a 57 IQ score obtained in 1972 (age 13) on the Slosson; a 78 IQ score obtained in 1973 (age 13) on the WISC; an estimated full scale IQ score of 71 obtained in 1984 (age 30) on an abbreviated WAIS-R; a 74 IQ score obtained in 1989 (age thirty) on a complete WAIS-R;[38] an 85 IQ score obtained in 2013 (age 54) on the RCPM administered by Dr. Borda; and a 59 IQ score obtained in

---

[38] There appears to be an uncorrected scoring error associated with the 1989 WAIS-R. A raw score of 7 appears on the Digit Span subtest. Per the scoring table, the corresponding scaled score should be 4, but the test administrator wrote 5. At the 2014 evidentiary hearing, applicant offered no testimony about a scoring error or its effect on the reported IQ score of 74. In Addendum Finding 112, the habeas court noted the scoring error and stated, "The correction of this error means that the scaled score for Verbal Tests is now 32, rather than 33. With reference to the WAIS-R manual, the accurate full scale score should actually be one point lower, which equates to a [full scale] IQ score of 73."

There was no testimony at the 2014 evidentiary hearing about the WAIS-R manual, nor was the WAIS-R manual admitted into evidence at the hearing or filed with the habeas court. Thus, the record does not support the habeas court's finding that applicant's WAIS-R score was actually 73 rather than 74. But even if we were to assume that applicant's WAIS-R score was actually 73, it does not change our determination that he has failed to prove significantly sub-average general intellectual functioning.

2014 (age 54) on the WAIS-IV administered by Dr. Compton. Applicant also asks us to rely on the IQ scores that Borda and Garnett derived from the mental-age scores that he obtained in 1973 (age 13) on the Bender Gestalt and Goodenough tests administered by Marcelle Tucker.

At the 2014 evidentiary hearing, Borda identified the 57 IQ score on the Slosson as the first and most accurate assessment of applicant's IQ.[39] Borda reached that conclusion because, due to "practice effects in IQ testing, usually the most accurate assessment is the first test that's done."[40] He also cited applicant's lack of incentive to do poorly. Borda initially acknowledged that, like the RCPM, the Slosson is a group-administered test and not one that is widely used. On further redirect examination, Borda asserted that, like the RCPM, the Slosson could also be individually administered, but he acknowledged that the Slosson was not a test that he would use.

Borda discounted applicant's 78 IQ score on the WISC. First, Borda asserted that applicant's WISC score should be adjusted to 70 for the Flynn Effect. Second, Borda noted that applicant contemporaneously took Bender Gestalt and Goodenough tests. Although he acknowledged that the Bender Gestalt and Goodenough tests are not IQ tests, Borda explained that he used applicant's mental-age scores on those instruments to derive IQ

---

[39] In his affidavit, Borda acknowledged that applicant took the OLMAT in 1971, but asserted that the OLMAT is "a test used primarily to assess academic needs and is not accepted as an instrument appropriate for the assessment of [intellectual disability]."

[40] The AAIDD states that the "practice effect" refers "to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument." INTELLECTUAL DISABILITY 38.

scores. Borda stated that he calculated an IQ score of 67 on the Bender Gestalt and an unspecified IQ score on the Goodenough. He then adjusted both derived scores for the Flynn Effect, arriving at a 56 IQ for the Bender Gestalt and a "mid-60s" IQ score for the Goodenough. Borda testified that the derived, Flynn-Effect-adjusted IQ scores on the Bender Gestalt and Goodenough tests indicated that the WISC score overstated applicant's level of intellectual functioning.

Borda also discounted applicant's 74 IQ score on the 1989 WAIS-R, asserting that it should be adjusted to 71 for the Flynn Effect.[41] Borda asserted that applicant's 85 IQ score on the RCPM could be artificially high due to the practice effect because the RCPM is very similar to the matrices portion of the Wechsler Scale IQ tests. But Borda acknowledged that, when he gave the RCPM, applicant had not been subjected to any meaningful IQ testing for over a decade. Borda also acknowledged that the AAIDD is the commonly accepted national authority on intellectual disability and that, per the AAIDD, the practice effect is nonexistent after seven years.

Borda acknowledged that he did not conduct effort testing when he assessed applicant. Borda asserted that no good effort test exists for people with below-average IQs because most such tools gauge memory; therefore, people with memory problems will not score well on them. He also testified that effort tests are not normed for the below-average IQ population. Borda further asserted that, for a person with as much experience as he

---

[41] In response to a question that apparently referred to Compton's WAIS-IV testing, Borda acknowledged that applicant's IQ had been tested more recently, but stated that he had not reviewed those results.

possessed, any malingering would be obvious from simple observation. But Borda denied taking the position in his testimony that effort testing is inapplicable to intellectually disabled people.

Borda agreed that applicant had a difficult childhood, describing it as "a horrible background" in which "a very authoritarian father" created "a very dependent" and "fearful" child. Although he acknowledged that applicant's childhood environment did not help his intellectual development, Borda asserted that applicant was "very limited" to begin with. Borda acknowledged that a learning disability is not the same as intellectual disability and that emotional disturbances (including depression) and environmental conditions (including living in an abusive household or having parents who are not intellectually curious) can adversely affect a person's learning ability and IQ scores. Borda also acknowledged that facing the death penalty could adversely affect motivation or cause depression and negatively affect test performance.

Borda acknowledged that others testified that applicant had done well and improved his academic skills while on death row. However, Borda did not find this testimony persuasive. Borda concluded that applicant was able to develop these skills on death row because he had abundant time to practice very specific and essentially unchanging tasks.

Greenspan disregarded applicant's 77 IQ score on the OLMAT, asserting that the OLMAT is a group-administered test. He stated that group-administered tests are not comprehensive and do not yield a full-scale measure of intelligence. Greenspan also

discounted applicant's 57 IQ score on the Slosson. Greenspan testified that, while the Slosson could be individually administered, it is a screening test that is not as comprehensive as the WISC and it is not considered a gold-standard test for diagnostic purposes. Greenspan also stated that the version of the Slosson test given to applicant derived IQ scores by the unreliable and now-abandoned ratio method that compared chronological and mental age. He testified that the Slosson is now scored using the more valid statistical-deviation method. Greenspan further indicated that the degree of statistical deviation from the mean is the currently accepted method of evaluating an individual's intellectual functioning.

Greenspan testified that the Wechsler scale is considered the gold standard. But Greenspan testified that applicant's 78 IQ score on the WISC should be reduced for the Flynn Effect to below 70, if applicant took the original WISC, or to between 70 and 71, if applicant took the WISC-R. Greenspan testified that, even without correcting for the Flynn Effect, the standard error of measurement (SEM) meant that applicant's WISC score could have been as low as 73. But Greenspan also volunteered that the score obtained on the WISC by someone who, like applicant, came from a poor, African-American family could underestimate the actual level of intellectual functioning.

Greenspan testified that the WAIS-IV is the current gold standard for IQ tests, and he emphasized that applicant obtained an IQ score of 59 on the WAIS-IV that Dr. Compton had recently administered. Although he had earlier testified that applicant's Slosson score was unreliable, Greenspan emphasized that applicant's WAIS-IV score was almost identical to

applicant's Slosson score.[42]

On direct examination, Greenspan testified that the validity of effort tests for people in the intellectually disabled range had not been adequately established. Greenspan asserted that the two best indicators of effort for intellectually disabled people are (1) the clinical judgment of an experienced evaluator; and (2) whether current test results are congruent with past test results, especially on tests given when the subject had no incentive to do poorly. Based on the testimony given at the 2014 evidentiary hearing by applicant's relatives, Greenspan concluded that a lack of ability was a more likely explanation for applicant's poor test scores than a lack of good effort.

On cross-examination, however, Greenspan acknowledged that the recommended practice in forensic psychology is to conduct effort testing, especially when one is administering cognitive measures. Greenspan denied taking the position, on direct examination, that effort testing is less applicable to someone with intellectual disability. He clarified that the results of effort tests given to intellectually disabled people are more difficult to interpret, because of problems validating effort tests for low IQ individuals. Greenspan agreed that it is important to analyze the results of IQ testing to ensure validity, especially when an external motive to exaggerate symptoms might exist. Greenspan also agreed that, for many people, facing the death penalty would be a significant external

---

[42] Neither party elicited testimony from Greenspan regarding applicant's 85 IQ score on the RCPM given by Borda.

motivating factor. Greenspan volunteered that "there are all kinds of reasons why someone would give a poor effort and one of them is if you have a history of failure in academic settings[;] you might go too quickly or you might not give optimal effort because you just assume it's not going to make any difference."

Anderson did not administer any IQ testing when she examined applicant. She did not testify about the reliability of any particular IQ test or IQ score reflected in the record.[43] She acknowledged that factors unrelated to a person's actual mental ability can lower test scores, including depression, psychosis, and external motivations to obtain a lower score, such as facing the death penalty.[44]

Compton disregarded applicant's OLMAT and Slosson scores, stating that those instruments were group tests and lacked high validity. Compton indicated that applicant's 1972 Slosson score was particularly problematic due to research suggesting that, in the 1970s, the Slosson had extremely poor validity in determining intellectual disability. Compton also disregarded the Bender Gestalt and Goodenough tests because they were neuropsychological screening instruments rather than IQ tests.

Compton testified that applicant's 78 IQ score on the WISC was the most reliable IQ

---

[43] Anderson's report contains a paragraph discussing some of applicant's IQ test scores, identifying the IQ test by the year of administration. The record does not support Anderson's representation of applicant's IQ scores, including her assertion that, in 1989, applicant obtained "a full scale IQ of 71" which "did not deviate much from prior scores." The record before us indicates that the only IQ score of 71 that applicant obtained was an estimated full scale IQ score of 71 on an abbreviated WAIS-R administered to him by TDCJ in 1984. Anderson appears to challenge the validity of applicant's IQ scores on the 1973 WISC (78 IQ) and 1989 WAIS-R (74 IQ), but the basis for her criticism is unclear.

[44] The MMPI administered by TDCJ in 1984 concurrently with the abbreviated WAIS-R revealed elevations on the psychotic scales and a significant probability of psychiatric disturbance.

score reflected in his records because it was the first and only full scale, individually administered IQ test given during the developmental period. Compton stated that, because she could not tell whether applicant took the original WISC or the WISC-R, she made alternative Flynn Effect adjustments to his reported score: 69 to 70 IQ, assuming that applicant took the original WISC, and 73 to 74 IQ, assuming that he took the WISC-R. Compton noted that applicant's IQ might be higher than his Flynn-Effect-adjusted WISC score because family reports suggested that he was traumatized as a child by paternal abuse. Compton explained that childhood trauma can cause low IQ scores because the stressful environment makes it difficult for the child to get enough rest, focus, and learn.

Compton, who testified that she had worked in a prison system, doubted the validity of applicant's IQ scores on TDCJ-administered tests because prison IQ assessments do not typically include effort testing. Compton asserted that effort testing is important when assessing cognitive deficits because, if the subject is not exerting effort, the assessment will inaccurately represent his ability.

Compton also stated that many inmates are depressed and that depression can lower IQ scores. Although TDCJ never formally diagnosed applicant with depression, he exhibited withdrawn and depressive behavior throughout his time on death row, and he demonstrated similar behavior earlier in his life. Compton also noted a 2005 TDCJ report stating that applicant wrote a suicide note, although the report indicated that applicant denied having

written it.[45]  Compton testified that applicant's affect was flat during her evaluation and he seemed a little depressed.  Although he denied being currently depressed, applicant admitted that he had experienced some depression in the past.  And while applicant was not formally diagnosed with depression during his schooling, school officials twice recognized that he was experiencing emotional disturbances.

Compton did not consider applicant's 59 IQ score on the WAIS-IV that she administered to be valid due to persistent indicators throughout her assessment that applicant was exerting suboptimal effort.[46]  After interviewing him about his personal history, Compton gave applicant the Test of Memory Malingering (TOMM), an effort test.  Compton testified that applicant's results suggested that he was not exerting full effort, even when she gave him the benefit of the doubt by assuming that he was intellectually disabled and applying only the specific norms for intellectually disabled individuals.[47]  When Compton subsequently administered the WAIS-IV, applicant obtained a full scale IQ score that was

---

[45] The record shows that 2005 is the same year in which applicant wrote a letter to the habeas court, asking the court to allow him to withdraw his appeals and to set his execution date, and later filed a *pro se* motion requesting the same relief.

[46] Compton testified that she adjusted applicant's WAIS-IV score to 57 to account for the Flynn Effect.

[47] Compton disagreed that it was inappropriate to give effort tests to intellectually disabled individuals.  She also testified that, according to the primary research, the TOMM has good reliability when administered to intellectually disabled people.  Compton also assessed applicant's effort through embedded measures in the IQ and memory tests she administered.  She stressed that, contrary to the assertions of applicant's experts, these embedded measures were normed on intellectually disabled people.  And to give applicant the greatest benefit of the doubt, Compton did not compare his scores to the overall clinical sample when interpreting his results on the embedded effort measures.  Instead, Compton compared applicant's scores to the norms for individuals who were known to be intellectually disabled, those for individuals with traumatic brain injuries (TBIs), those for people with only eighth-grade educations, and those for people of different ethnicities and cultures.

significantly lower than she had expected.[48]  Further, Compton stated, her analysis of applicant's WAIS-IV results revealed pervasive internal discrepancies that indicated suboptimal performance.

Compton testified that her analysis of applicant's WAIS-IV results also revealed a significant discrepancy between the crystallized knowledge that applicant had demonstrated in 1989 intelligence testing and what he currently professed to know.  When Compton asked applicant what a thermometer was, he told her that he did not know, although he had answered the same question correctly when an examiner had asked it in 1989.  Compton stated that it was rare to simply forget the meaning of a previously known word and noted that both her own and Dr. Anderson's testing had placed applicant's memory in the low-average range.  When Compton checked the validity of her WAIS-IV testing with additional effort testing, the results (lower than expected scores and indications of suboptimal effort) were very similar to applicant's WAIS-IV results.

The record does not support considering applicant's IQ scores on the OLMAT, Slosson, 1984 abbreviated WAIS-R, 2013 RCPM, or derived IQ scores on the Bender Gestalt and Goodenough tests given in 1973, because of the evidence that these instruments were noncomprehensive screening or group IQ tests, neuropsychological tests rather than IQ tests, or derived IQ scores using the ratio method and concept of mental age rather than the degree

---

[48]  Compton testified that she had expected applicant to obtain a full scale IQ score in the 70s, based on what she had seen, applicant's history, and his education level.

of statistical deviation from the mean.[49] The record additionally does not support considering applicant's IQ score on the WAIS-IV, given the compelling evidence of his suboptimal effort on that instrument. We are left with applicant's 78 IQ score on the WISC at age 13 in 1973 and his 74 IQ score on the WAIS-R at age 30 in 1989.

Taking into account the standard error of measurement, applicant's score range on the WISC is between 73 and 83. The fact that applicant took a now-outmoded version of the WISC in 1973 might tend to place his actual IQ score in a somewhat lower portion of that 73 to 83 range. *See Cathey*, 451 S.W.3d at 18. However, the evidence that applicant was traumatized by paternal violence, was referred for testing due to withdrawn behavior, came from an impoverished and minority cultural background, and started to abuse drugs by the time of testing might tend to place his actual IQ in a somewhat higher portion of that 73–83 range. *Cf. id.* "Taken altogether, there is no reason to think that applicant's obtained IQ score" of 78 on the WISC "is inaccurate or does not fairly represent his borderline intelligence during the developmental stage." *Id.*

The score that applicant obtained on the 1989 WAIS-R supports the conclusion that

---

[49] According to the AAIDD,

> It is important to note that IQ scores derived from an intelligence test are now developed on the basis of a deviation (from the mean) score and not on the older conception of mental age. Thus, in reference to the significant limitations in intellectual functioning criterion for a diagnosis of [intellectual disability], a valid diagnosis of [intellectual disability] is based on how far the person's score deviates from the mean on the respective standardized assessment instrument and *not* on the ratio of mental age to chronological age.

INTELLECTUAL DISABILITY 35; *see also Penry*, 492 U.S. at 339–40 (O'Connor, J.) (noting that the "mental-age" concept is problematic in several respects).

his WISC score accurately and fairly represented his intellectual functioning during the developmental period.[50] Applicant's score range on the WAIS-R is between 69 and 79. As with the WISC, the fact that applicant took a now-outmoded version of the WAIS-R might tend to place his actual IQ score in a somewhat lower portion of that 69 to 79 range. *See id.* However, by the time he took the WAIS-R, applicant had a history of academic failure, something that his own expert stated could adversely affect effort. Applicant also took the WAIS-R under adverse circumstances; he was on death row and facing the prospect of execution, and he had exhibited withdrawn and depressive behavior. These considerations might tend to place his actual IQ in a somewhat higher portion of that 69 to 79 range. *Cf. id.* Considering these factors together, we find no reason to doubt that applicant's WAIS-R score accurately and fairly represented his intellectual functioning as being above the intellectually disabled range. *See id.*

## B. Significant, Related Deficits in Adaptive Behavior

Even if applicant had proven that he suffers from significantly sub-average general intellectual functioning, his *Atkins* claim fails because he has not proven by a preponderance of the evidence that he has significant and related limitations in adaptive functioning.

At the 2014 evidentiary hearing, Borda defined adaptive functioning as the ability to

---

[50] In Addendum Findings 111 and 113, the habeas court asserted that applicant's score on the 1989 WAIS-R was likely affected by the practice effect because he was given an abbreviated WAIS-R the previous day. The findings are not supported by the record, which shows that, on January 26, 1989, TDCJ psychologist James Majors gave applicant the Vocabulary and Block Design subtests of the WAIS-R. On the following day, January 27, 1989, Majors administered the WAIS-R's remaining subtests. As such, the record does not support a finding that there was a duplication of subtests within a short period of time that resulted in an artificially high score on the 1984 WAIS-R.

successfully do everyday things on one's own. But Borda also asserted that adaptive functioning describes a concept that is more complicated than being able to perform a certain specific task, such as balancing a checkbook. He characterized adaptive functioning as neuropsychological or executive frontal-lobe functioning, such as the ability to make a decision, implement the decision, assess whether one is getting to a correct solution, and if not, to modify his behavior.

On direct examination, Borda agreed with habeas counsel's statement that applicant's family history indicated that applicant had "strong" problems adapting, as to social behaviors and the academic realm. But Borda gave no more specific testimony about deficits in adaptive behavior.[51] On cross-examination and redirect, Borda acknowledged that standardized measures of adaptive functioning exist, that many adolescents with poor adaptive skills—for example, homeless teenagers—are not intellectually disabled, and that just because someone lacks certain skills does not mean that the person is intellectually disabled. Borda also acknowledged that applicant had adaptive skills during the developmental period, but opined that they were probably below average for someone of his age.

The State asked Borda whether evidence that applicant mowed grass for money and

---

[51] To the extent that, in his affidavit, Borda identified certain "marked" or "severe" deficits in applicant's adaptive behavior, the record does not support several of his factual assertions. In addition, Borda did not contend in his affidavit that the deficits he identified were related to significantly sub-average general intellectual functioning. In any event, the record does not support such a conclusion.

hustled pool suggested that he had money skills, knowledge that he needed to earn money, and the self-direction to obtain a job to make it. Borda suggested that he did not have sufficient information to render an opinion because he did not know whether applicant had independently thought of these ways to make money. Borda initially suggested that the offense facts did not indicate that applicant possessed adaptive skills, due to Borda's impression that others dragged applicant into it, that applicant went along because he was afraid to say no, and that no particular planning went into the offense. Borda stated that intellectually disabled people are suggestible and, if told to do something, they will do it. But Borda acknowledged that he did not know much about the offense and had not read applicant's confession or trial testimony.

Greenspan testified that, for purposes of diagnosing intellectual disability, "adaptive functioning" concerns how one functions in the world. He stated that adaptive functioning is not the same as executive functioning, which is a cognitive measure that looks at certain underlying reasoning skills. On direct examination, Greenspan asserted that he saw no evidence of applicant's competence in any of the adaptive behavior areas. On cross-examination, Greenspan acknowledged that applicant had areas "of greater ability," but asserted that they did not exclude an intellectual-disability diagnosis. Although Greenspan stated that he was generally familiar with the facts of applicant's offense, he acknowledged that he had not read the transcript of either of applicant's two trials.

Greenspan testified that the Texas Independent Living Scale (TILS) given to applicant

by Dr. Compton is a standardized test that is generally accepted within the psychological community and considered a direct measure of adaptive behavior. He emphasized that applicant scored two-and-a-half standard deviations below the mean on the TILS.

Greenspan minimized the evidence that applicant had learned to survive on the street and in prison. Despite his earlier definition of adaptive behavior, Greenspan asserted that applicant's ability to function in prison and street environments did not necessarily reflect "adaptive" behavior, as that term is understood by the psychological community. Greenspan did not think that any of applicant's performance on the following activities evidenced adaptive skills: (1) in preparation for his new punishment trial, consulting with counsel about whether to inform the jury that he had been on death row; (2) concealing a shotgun in a shopping bag when entering a store to rob it; (3) attempting to conceal his appearance during the offense by wearing a wig and sunglasses, and after the offense, changing his appearance by shaving his head; (4) arguing with accomplices over how to divide the proceeds of the crime; (5) deciding to stipulate that he had prior criminal convictions and responding appropriately to questioning by the court to determine whether the stipulation was voluntary, knowing, and intelligent; (6) writing four letters to his appellate lawyer that escalated from, "When are you going to file my appeal?," to "I object to you getting any extensions" to "Why won't you respond to any of my letters?" to "I object to you being my lawyer from this point forward"; (6) hustling pool; and (7) working as a barber and a porter in prison.

Anderson testified that she conducted a group interview of applicant's relatives to determine whether applicant had any longstanding, chronic deficits. From applicant's relatives, Anderson learned that he had unspecified deficits that were seen early and reported by his school. Applicant's relatives also told Anderson that he was never left alone, someone had to "hold his hand," and he needed help with his homework.[52]

Anderson acknowledged that, if a person donned a wig before entering a business to commit robbery, it indicated some forethought and planning, but she could not say whether the behavior showed an ability to protect one's self-interest. Anderson had no opinion on whether walking into the business with a shotgun concealed in shopping bags demonstrated an ability to plan ahead and protect one's self-interest. Anderson testified that committing a crime and then fleeing to another city did not necessarily demonstrate the ability to form and execute a plan for self-preservation. Anderson denied seeing evidence that applicant had excelled in any way since being imprisoned.

Compton stated that adaptive functioning examines everyday social, practical, and conceptual skills. She testified that she gave applicant a TILS test and acknowledged that applicant's TILS score fell two-and-a-half standard deviations below the mean. But Compton explained that the TILS score was not an accurate representation of applicant's abilities because she had to assign zeroes to questions asking about areas to which applicant

---

[52] In her report, Anderson stated that, during the developmental period, applicant "had some abilities as they relate to self-care, motor skills, and daily living. However, he had equally as many deficits in the adaptive domains which fall primarily under socialization, communication, and cognition."

had no exposure, such as writing a check and using a microwave oven.

When Compton gave applicant a complete WRAT-4, a test of academic abilities, his results fell within the second-grade level for mathematical skills and the third-grade level for reading comprehension and writing skills. Compton noted that applicant's writing ability scores on the WRAT-4 were inconsistent with the seventh-grade level ability he had demonstrated in letters he had written to friends. Compton testified that applicant's performance on the WRAT-4 math subtest was also internally inconsistent. Although applicant was able to perform advanced math at certain times, at other times, he missed very simple questions. Applicant's performance on the WRAT-4 math subtest was also inconsistent with abilities he had demonstrated elsewhere, including in his commissary records. Compton testified that these inconsistencies increased the probability that applicant was not exerting full effort on the WRAT-4 math subtest.

Compton testified that she found some limitations in applicant's academic skills and some adaptive deficits in social interaction during the developmental period, but she also saw evidence of adaptive skills. For example, she saw evidence that applicant had lived in the back of a pool hall, as well as evidence that he had played pool and mowed lawns for money. Compton said that living on the streets in itself required applicant to engage in adaptive behavior. She opined that playing pool and mowing lawns showed some ability to understand money and work concepts.

Compton also saw evidence that applicant possessed adaptive skills at the time of the

offense and original trial. Applicant's behavior surrounding the crime (wearing a wig, covering up the gun, and fleeing to Louisiana) all indicated planning, forethought, and an appreciation of the need to do something to avoid apprehension, which also related to his ability to engage in abstract thinking.

Compton added that applicant's 1980 trial testimony indicated that he had some ability to engage in abstract reasoning because he was able to conceptualize what his counsel and the State were asking and to form appropriate and exculpatory answers. Compton noted that applicant withstood both direct and cross examination and he testified in a coherent fashion. Compton stated that testifying and undergoing cross examination is a stressful experience for most people. Applicant's 1980 trial testimony also showed that he was able to process and respond to questions without significant difficulty even under stressful conditions. Applicant's testimony showed that he could conceptualize the process and form exculpatory responses and alternative explanations, which further indicated an ability to process and manipulate information and form a response. Compton acknowledged that defense counsel may have prepared applicant for his 1980 trial testimony, but she noted that applicant had not had a lawyer to coach him for his 1983 *Faretta* hearing, at which he represented himself. Applicant had been able to understand what the trial court was asking him at the *Faretta* hearing and had responded appropriately, although he had difficulty with some of the legal issues.

Compton also saw evidence that applicant had developed adaptive skills in prison.

In addition to representing himself at the 1983 *Faretta* hearing, applicant had learned to read and write in prison. His personal, handwritten correspondence demonstrated a seventh-grade writing ability. Compton indicated that applicant's writing ability could exceed a seventh-grade level if he also wrote the various handwritten and typewritten *pro se* motions presented at the evidentiary hearing. Regarding the handwritten *pro se* motions, Compton observed that the handwriting was very similar to the handwriting that she had seen throughout her review of applicant's case. Regarding the typewritten documents, Compton testified that applicant told her that he did not know how to type and that she had been told that he did not own a typewriter.[53] Compton also acknowledged that inmates share pleadings and that Fronciewiz had testified that inmate David Harris had worked for applicant at one time.[54] But Compton testified that simply being involved in the process by copying the motions by hand would indicate understanding and require the ability to write. Compton opined that copying a legal motion would be something within the realm of only a few intellectually disabled people.

Compton found additional evidence of adaptive skills in applicant's TDCJ records.

---

[53] It is unclear from the record who told Compton that applicant did not own a typewriter. Regardless of the source of this information, applicant's TDCJ records filed with the habeas court include a property receipt from the commissary. The receipt, which is dated March 11, 1993, and bears applicant's name, is for an electronic word-processor.

[54] We note that Harris was not convicted of capital murder until April 29, 1986, and was executed in June 2004. *See Ex parte Harris*, 136 S.W.3d 669 (Tex. Crim. App. 2004). Although applicant's TDCJ records show requests for legal visits with other inmates, the earliest such request is dated May 21, 2002. The earliest request for a legal visit with Harris, in particular, is dated June 29, 2002. The latest request for a legal visit with Harris is dated April 20, 2004. Accordingly, it does not appear that Harris could have assisted applicant with his *pro se* filings received by this Court and the trial court between October 1980 and July 1983.

She testified that a disciplinary report stated that another inmate had been in applicant's cell to play dominoes. Compton opined that this indicated that applicant possessed social interaction skills and the ability to count because the game of dominoes required that skill.[55]

Compton noted that applicant's TDCJ classification file included a letter and questionnaire from TDCJ to the manager of Two-K restaurant, where applicant had previously worked. Compton agreed that the manager's responses showed that applicant could function in the capacity for which he had been hired. Regarding disciplinary problems, the manager had written that applicant was "capable of influencing others to dissent [and] like[d] confrontation." Compton testified that the comment evidenced applicant's conceptual and leadership skills.

Compton agreed that applicant's classification file also included a Social Summary, dated December 1, 1983, in which applicant had cited the advice of counsel and declined to discuss his offense. Compton stated that the fact that applicant declined questioning on the advice of counsel showed that he had the ability to understand instruction, conceptualize it, and act on it. Compton testified that incidents documented in applicant's death-row disciplinary records demonstrated his ability to form the intent to influence other people and to act on it, which fell within the social-skills domain, and the ability to stand up to authority, which was inconsistent with suggestibility and gullibility.

---

[55] On cross-examination, Compton acknowledged that the disciplinary report did not show that applicant agreed about why the inmate was present and that the reporting officer did not state that he actually saw applicant playing dominoes. But Jemma Levinson's notes of her May 25, 2000 interview with applicant, offered in his Factual Supplement, show that applicant told Levinson that he played dominoes with another inmate, and he referred to a disciplinary incident stemming from this activity.

Compton also found evidence of adaptive skills in items that had recently been found in applicant's cell. Compton stated that a packet of handwritten letters, which were all in the same handwriting, had a seventh-grade-level readability score. She testified that a composition notebook found in applicant's cell contained the same handwriting throughout it. Although Compton acknowledged that applicant might have copied some of the notebook's contents from other sources, she indicated that other parts might have been the product of applicant's independent thought. The composition book contained a handwritten table matching the Wechsler Scales's normal distribution of IQ scores, which suggested to Compton that applicant was investigating IQ scores from his prison cell.

Compton agreed that books, a newspaper, and newspaper articles were found in applicant's cell. Each of the books, which included copies of the Qur'an and Know Your Islam, had applicant's name, inmate identification number, and a date written inside the cover. One of the articles concerned winning an appeal. Many of the books and newspaper articles found in applicant's cell contained underlining. Compton testified that an underlined passage could indicate that a person is reading and comprehending the underlined text. Although Compton acknowledged that people sometimes also underline passages that they do not fully understand, she testified that the action of underlining indicates the person's desire to return to the passage and review it, and thus still involves processing and conceptualization. Compton also stated that even if a person underlines passages because he does not understand them, the act implies that he has understood the surrounding text.

Other items found in applicant's cell included heavily notated calendars for the years 2012 through 2014. Compton testified that notations on the calendars indicated that applicant understood the concept of months, an understanding that he also demonstrated in Compton's testing. She agreed that the calendars had sections for people's names, addresses, and telephone numbers, all of which were appropriately completed.

Compton also found it significant that applicant's expert witnesses at the 2001 punishment retrial (i.e., Halpin and Wright) determined that applicant's adaptive abilities had progressed since his imprisonment and that his progress indicated that he had a strong ability to learn. Compton noted that another witness at the 2001 retrial, Jo Ann Cross, had echoed Halpin's and Wright's testimony regarding applicant's ability to learn.

We find Compton's opinion far more credible and reliable than those of applicant's experts who testified at the 2014 evidentiary hearing.[56] The record shows that Compton is a forensic psychologist with considerable experience in conducting forensic evaluations. Her testimony shows that she thoroughly and rigorously reviewed a great deal of material concerning applicant's intellectual functioning and adaptive behavior. In addition, she personally evaluated applicant. During that evaluation, Compton administered comprehensive IQ testing via the WAIS-IV, a gold-standard test; various forms of effort testing to assess the validity of her IQ testing; and the TILS, a standardized measure of

---

[56] Although applicant presented Garnett's and Vitale's affidavits in support of his *Atkins* claim, neither affiant personally examined applicant and neither purported to diagnose applicant as intellectually disabled. Further, neither Garnett or Vitale testified at the evidentiary hearing. The bases for the assertions in their affidavits were therefore not subject to adversarial testing through cross-examination.

adaptive functioning. Compton testified in detail about why, even applying the most lenient standards, the results of her effort testing suggested that applicant had exerted suboptimal effort on the WAIS-IV. Compton also gave persuasive and unrebutted testimony explaining why applicant's score on the TILS under-represented his adaptive skills. She further detailed numerous examples in applicant's records that demonstrated his adaptive skills.

In contrast, Borda, Greenspan, and Anderson were clinical psychologists or clinical neuro-psychologists whose credibility suffered from their review of relatively limited material. Greenspan did not personally assess applicant, and his testimony suggested that his direct experience with IQ testing was fairly limited and remote in time.

Although he personally examined applicant, Borda conceded that the assessment was extremely brief and did not include comprehensive, full-scale IQ testing with a gold-standard instrument or effort testing. Borda and Greenspan also premised many of their conclusions on the concept of mental age and used the unreliable ratio method to calculate IQ scores from instruments that were not designed for such purposes. Although Anderson personally examined applicant, she did so for a purpose other than evaluating him for intellectual disability. Further, Anderson did not administer any test for the purpose of obtaining an IQ score and, from her testimony, she appeared to have completed relatively few intellectual-disability assessments.

Further, each of applicant's experts who testified at the evidentiary hearing appear to have applied a more demanding standard to the issue of adaptive behavior than we have

contemplated for Eighth Amendment purposes. *See Cathey*, 451 S.W.3d at 19, 26–27.

Although Borda testified that adaptive functioning is the ability to successfully do everyday things on one's own, he also characterized it as executive functioning.[57] Greenspan defined adaptive behavior as how one functions in the world and expressly acknowledged that adaptive behavior and executive functioning are distinct concepts. However, Greenspan's application of the definition to the evidence—for example, his minimization of the evidence that applicant had learned to survive on the street and in prison—suggest that he was actually applying a more stringent standard. Alternatively, it suggests that Greenspan's opinions were not reasonable. Anderson was not asked to define adaptive functioning, but in her testimony, she often equated adaptive functioning with executive functioning.

Compton's opinion finds further support in applicant's school records, which were accurately summarized at the 2001 punishment retrial by applicant's expert witness, Dee Dee Halpin. *See Cathey*, 451 S.W.3d at 23 (stating that the best source of retrospective information concerning adaptive behavior during the developmental period is usually school records because they provide an objective, unbiased documentation of a person's abilities at

---

[57] Borda's definition of adaptive functioning as executive functioning appears to be inconsistent with the clinical standards that he purported to follow. According to Borda's affidavit, the DSM-V recognizes executive-functioning measures as more reliable indicators of intellectual functioning than IQ tests. But his affidavit is silent concerning whether the DSM-V recognizes executive-functioning measures as more reliable indicators of adaptive functioning than a standardized measure of adaptive functioning, for example. Borda appears to have imported the DSM-V's recognition of executive-functioning measures in the intellectual-functioning context into the adaptive-functioning context. In the process, Borda seems to have implicitly transformed "adaptive functioning" into something more complex than the ability to perform a task.

the most pertinent time). Those records reflect applicant's poor academic grades (especially in areas involving language), uneven conduct grades, retention in first grade, below-grade-level scores on academic-achievement tests, and references to instances of withdrawn behavior. In kindergarten, a physician considered the possibility that applicant's withdrawn behavior was due to intellectual disability, although the physician indicated that emotional problems were the more likely cause. Subsequent IQ testing on a gold-standard instrument yielded a score that was not in the intellectually disabled range—even considering the extreme low end of the scoring range—and applicant remained in regular classrooms throughout his time in school.

Although Compton found that applicant manifested some limitations in academic and social-interaction skills during the developmental period, she testified that his level of adaptive functioning had been too great, even before he went to prison, to support an intellectual-disability diagnosis. But even assuming for purposes of argument that applicant's limitations in academic and social-interaction skills were significant, the record does not support a finding that these deficits were linked to significantly sub-average general intellectual functioning. *See Hearn*, 310 S.W.3d at 428. Rather, the record overwhelmingly supports the conclusion that applicant's academic difficulties were caused by a variety of factors, including trauma from the emotionally and physically abusive atmosphere in which he was raised, undiagnosed learning disorders, changing elementary schools three times in three years, racially motivated harassment and violence at school, a history of academic

failure, drug abuse, and absenteeism. The same is true of any social difficulty that applicant experienced during the developmental period.[58]

The significant advances applicant has demonstrated while confined on death row further support the conclusion that his academic and social difficulties were not related to significantly sub-average general intellectual functioning. In addition, our consideration of the *Briseno* evidentiary factors weighs heavily against a finding that applicant's adaptive deficits, of whatever nature and degree they may be, are related to significantly sub-average general intellectual functioning.

The first *Briseno* factor considers whether those who knew applicant best during the developmental stage considered him to be intellectually disabled and acted in accordance with that determination. *Briseno*, 135 S.W.3d at 8. The evidence does not weigh in applicant's favor.

Although the physician who examined applicant before kindergarten considered intellectual disability as a possible cause for applicant's withdrawn behavior, the physician contemporaneously stated that emotional problems were the more likely cause. Applicant's records do not reflect any intellectual-disability diagnosis, and they do show that he remained in normal classrooms during his school career.

At the evidentiary hearing, habeas counsel attempted to show that applicant's father singled applicant out for abuse and threw applicant out of the house because he perceived

---

[58] Although the record contains evidence of withdrawn behavior by applicant, we note that the record also includes abundant evidence of applicant's social success during the developmental period.

applicant as being intellectually disabled or "slow." However, the record is replete with evidence that Junior physically and emotionally abused all of his children, as well as with evidence that Junior also drove some of applicant's siblings from the family home. Although there is evidence that applicant's inability to spell on command may have angered Junior, there is abundant evidence from multiple sources that applicant was the target of Junior's ire because he intervened in his parents' altercations, tried to protect his mother and other siblings from Junior, and often caught Junior in infidelity. The record also indicates that applicant was left in charge of his younger siblings. And applicant's sister, Colleen McNeese, testified at the 2014 evidentiary hearing that she had not considered applicant to be intellectually disabled.

Regarding the second *Briseno* factor, the evidence shows that applicant formulated plans and carried them through. *See id.* The various affidavits, testimony, and interviews that applicant's relatives have given indicate that, when he and his siblings were hungry, applicant took it upon himself to earn money from the neighbors and then used the money to buy food. During his 1980 trial, applicant insisted on presenting an alibi defense, and his testimony was consistent with that defense. He doggedly pursued his desire to obtain new appellate counsel after his 1980 trial by writing to various courts, attorneys, and organizations, filing pleadings and motions, and marshaling exhibits to present at the 1983 *Faretta* hearing. The previously mentioned conduct and incidents in applicant's prison disciplinary records also indicate leadership, the third *Briseno* factor. *See id.*

The fourth and fifth *Briseno* factors address whether applicant responds rationally and appropriately to external stimuli and whether he responds coherently, rationally, and on point to oral or written questions. *See id.* The many instances of applicant's testimony and interactions with courts over the course of this case, as well as the testimony of witnesses at his 2001 punishment retrial, indicate that the answers to these questions are yes.

The varying statements that applicant gave to police about the offense and his 1980 and 1993 testimony indicate that he can hide facts or lie effectively in his own interest, the sixth *Briseno* factor. *See id.* The facts of the offense further indicate that it required forethought, planning, and moderately complex execution of purpose, the final *Briseno* factor. *See id.* at 8–9.

### C. Onset During the Developmental Period

Given applicant's failure to prove by a preponderance of the evidence that he suffers from significantly sub-average general intellectual functioning and that any significant deficits in adaptive behavior are related to significantly sub-average general intellectual functioning, he has not established that he was intellectually disabled before the age of eighteen. *See id.*

In sum, we conclude that for Eighth Amendment purposes, applicant is a person capable of functioning adequately in his everyday world with intellectual understanding and moral appreciation of his behavior. *See Cathey*, 451 S.W.3d at 26–27 (summarizing the "basic factual nature of the *Atkins* inquiry"). We therefore reject applicant's contention that

he is exempt from execution under *Atkins*.

## IV. Conclusion

For the reasons discussed above, we deny relief on applicant's first claim after assuming our role as the ultimate fact-finder in this case regarding applicant's assertion that he is entitled to relief under *Atkins*. *See Flores*, 387 S.W.3d at 634–35; *Reed*, 271 S.W.3d at 727.

The habeas court did not enter findings of fact and conclusions of law regarding applicant's second and third claims for relief. In his second claim, applicant contends that he was denied due process because Texas's death-penalty statute does not contemplate intellectual disability as a bar to the execution of an intellectually disabled individual. In his third claim, applicant contends that his death sentence violated the Sixth Amendment under *Atkins* and *Ring v. Arizona*, 536 U.S. 584 (2002), because the jury's verdict did not include a determination of an essential element of capital murder—that he is not intellectually disabled. Applicant's briefing concerning his second claim is inadequate because he fails to plead and prove facts which would entitle him to relief. *See Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985). The Court has previously rejected the *Ring* argument that applicant raises in his third claim. *See Briseno*, 135 S.W.3d at 10. Applicant's second and third claims for relief are denied.

As to applicant's remaining claims (Claims 4–48), we find that the record supports the habeas court's findings of fact, conclusions of law, and recommendation. We

accordingly adopt "Respondent's Proposed Findings of Fact, Conclusions of Law, and Order" regarding Claims 4–48, and deny relief on all of applicant's claims.

Delivered: September 16, 2015
Publish